GROVE PRESS, INC., and Readers' Subscription, Inc., Plaintiffs-Appellees,

v.

Robert K. CHRISTENBERRY, Individually and as Postmaster of the City of New York, Defendant-Appellant.

No. 182, Docket 25861.

United States Court of Appeals Second Circuit.

Argued Dec. 2, 1959.

Decided March 25, 1960.

S. Hazard Gillespie, Jr., U. S. Atty.,
New York City (Robert J. Ward, John
W. Hasson, and Robert L. Tofel, Asst.
U. S. Attys., New York City, on the
brief), for defendant-appellant.

Charles Rembar, of Rembar, Zolotar
& Leavy, New York City (Morton E.
Yohalem and Sigmund Timberg, Wash-
ington, D. C., on the brief), for plaintiff-
appellee Grove Press, Inc.

Jay H. Topkis, of Paul, Weiss, Rif-
kind, Wharton & Garrison, New York
City, for plaintiff-appellee Readers' Sub-
scription, Inc.

Edgar W. Holtz, Acting Gen. Counsel,
Max D. Paglin, Asst. Gen. Counsel, and
Ruth V. Reel and Edward W. Hautanen,
Counsel, F. C. C., Washington, D. C., for
Federal Communications Commission, as
amicus curiae.

Before CLARK, WATERMAN, and
MOORE, Circuit Judges.

CLARK, Circuit Judge.

D. H. Lawrence completed the third manuscript version of his novel "Lady Chatterley's Lover" in Italy in 1928, and it was then published in Florence for private distribution. It is this version which has now been published by the plaintiff Grove Press, Inc., in a sumptuous edition selling for $6.00, with a prefatory letter of commendation by Archibald MacLeish, poet, playwright, and Boylston Professor of Rhetoric and Oratory at Harvard University, and with an extensive Introduction and a concluding Bibliographical Note by Mark Schorer, Professor of English Literature at the University of California and a Lawrence scholar.[1] The book (together with circulars showing its availability by Readers' Subscription, Inc., the second plaintiff[2]) has been detained as unmailable by the New York Postmaster and, after a hearing before the Judicial Officer of the Post Office Department and reference to the Postmaster General for final departmental decision, was held by the latter to be "obscene and non-mailable pursuant to 18 U.S.Code § 1461." The Postmaster General wrote a substantial decision, of which these are salient paragraphs:

"The contemporary community standards are not such that this book should be allowed to be transmitted in the mails.

"The book is replete with descriptions in minute detail of sexual acts engaged in or discussed by the book's principal characters. These descriptions utilize filthy, offensive and de-

1. This edition has never before been legally published in this country or in England, although it has been frequently pirated here; and an abridged edition was published by Knopf in 1930. The complete version, however, has been published in some continental countries in English and in most in translation. It is not protected here by copyright, and various paperback editions—we are told—are now appearing. The ban in New York on the motion picture based on the novel was held invalid in Kingsley Inter-national Pictures Corp. v. Regents of the University of New York, 360 U.S. 684, 79 S.Ct. 1362, 3 L.Ed.2d 1512.

2. By stipulation Readers' Subscription, Inc., has agreed to be bound by the decision to be rendered as to Grove Press, Inc. The issues are identical.

We also have the application of the Federal Communications Commission to file a brief *amicus curiae*. The brief may be filed; but, since we do not find before us any issue affecting that agency, we make no ruling as to it.

grading words and terms. Any literary merit the book may have is far outweighed by the pornographic and smutty passages and words, so that the book, taken as a whole, is an obscene and filthy work."

The plaintiffs then sought a declaratory judgment and an injunction from the court below to reverse this decision. On cross motions for summary judgment, Judge Bryan gave a declaration that the Grove Edition here involved "is neither obscene, lewd, lascivious, indecent nor filthy in content or character, and is not nonmailable matter within the meaning of Title 18, Section 1461 of the United States Code." He also held that the bar order of the Postmaster General "is illegal and void and violates plaintiffs' rights in contravention of the Constitution," and entered an order permanently enjoining its enforcement. His complete and reasoned opinion, D.C.S.D.N.Y., 175 F.Supp. 488, with which we are in accord, gives further background, and reference is therefore made to it.

The important question on the merits is whether this now famous book is obscene within the meaning of 18 U.S.C. § 1461. This is a lengthy statute going back to 1876 and 1873 and amended as recently as 1958, which in portions here pertinent provides: "Every obscene, lewd, lascivious, indecent, filthy or vile article * * * is declared to be nonmailable matter and shall not be conveyed in the mails or delivered from any post office or by any letter carrier. Whoever knowingly uses the mails for the mailing, carriage in the mails, or delivery of anything declared by this section to be nonmailable * * * shall be fined not more than $5,000 or imprisoned not more than five years, or both, for the first such offense, and shall be fined not more than $10,000 or imprisoned not more than ten years, or both, for each such offense thereafter."

 But before we reach the merits, we must consider the procedural aspects of the issue involved, since the government on this appeal has directed much the greater force of its argument to a reliance upon the principle of administrative law that an agency action supported by substantial evidence is beyond judicial review. Its major contention is that the statute obligates the Post Office Department to prevent the conveyance of obscene matter through the mails and that, since the Postmaster General has made a finding of obscenity based upon substantial evidence, the district court erred in reviewing it. The district court rejected this contention of agency finality, and so do we.

Preliminarily we should note the query whether the statute, being one defining a crime with criminal penalties, may afford justification for the acts of seizure by the Postmaster General in any event, or whether its sanction is not limited to criminal prosecution for crimes already committed. This is an issue which divided the court in Sunshine Book Co. v. Summerfield, 101 U.S.App.D.C. 358, 249 F.2d 114, summarily reversed in 355 U.S. 372, 78 S.Ct. 365, 2 L.Ed.2d 352. It is one of serious difficulty; but we shall not attempt to resolve it here, since we think the result is clear on other grounds.

Judge Bryan ruled that the issue was one of law fully reviewable by a court of law, since there was no dispute in matters of evidence and hence there was no occasion for the application of the substantial evidence rule. Although this conclusion is vigorously attacked by the government, it is difficult to see why it is not sound, particularly as reinforced by the constitutional overtones implicit in the issue. There can be no doubt that in large areas of postal activity involving the delivery of the mail the Post Office Department exercises discretion not to be controlled by courts. But to determine whether a work of art or literature is obscene has little, if anything, to do with the expedition or efficiency with which the mails are dispatched. And here it is clear that no question of evidence was involved. In fact the Departmental officials considered only the novel itself against the background of the statute and declined to consider the expert opinion proffered by

the plaintiffs. The question was thus one starkly of law.[3] Moreover, the plaintiffs raised the constitutional issue of freedom of expression, Judge Bryan ruled upon it below, and it can hardly be escaped in this class of cases. See Smith v. People of the State of California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205; Roth v. United States, 354 U.S. 476, 479–489, 497, 506–508, 511–514, 77 S.Ct. 1304, 1 L.Ed.2d 1498. Even factual matters must be reviewed on appeal against a claim of denial of a constitutional right. Niemotko v. State of Maryland, 340 U.S. 268, 271, 71 S.Ct. 325, 95 L.Ed. 267; Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 506, 72 S.Ct. 777, 96 L.Ed. 1098. Both legally and practically the claim of final censorship powers here made for the Postmaster General is extreme.[4] Indeed it has received an incisive answer in the public press thus: "And courts, not post offices, are the proper places for a determination of what is and is not protected by the Constitution." Editorial, Lady Chatterley Embattled Again, N. Y. Herald Tribune, Dec. 9, 1959, p. 26.

Passing then to the merits we must of course be cognizant of the risk run by judges in enforcing obscenity statutes such as this and thus perchance condemning what become classics of our intellectual heritage. Some of the present Justices of the Supreme Court revolt against all this supervision as violative of constitutional precepts. But since the

statute has been upheld by majority vote, Roth v. United States, supra, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498; and see Smith v. People of the State of California, supra, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205, and Kingsley International Pictures Corp. v. Regents of the University of New York, 360 U.S. 684, 79 S.Ct. 1362, 3 L.Ed.2d 1512, it remains the duty of those of us who sit in inferior courts to enforce it as best we may. And we need have no illusions but that a large business is done in exploiting "hard core pornography" for money's sake. In general this trash is easily recognized, with its repetitive emphasis (usually illustrated) upon purely physical action without character or plot development; and even if its direct connection with crime or incitement to juvenile or other delinquency is not proven—as many now assert—it cannot arouse sympathy because of its essentially repulsive, as well as fraudulent, character. It is when we come to more genuine works of literature that troublesome issues arise.

At the outset we may well recall the classic warning by a great American judge in probably the leading case on the subject prior to the recent utterances of the Supreme Court, Judge Augustus N. Hand in United States v. One Book Entitled Ulysses by James Joyce, 2 Cir., 72 F.2d 705, 708:[5] "The foolish judgments of Lord Eldon about one hundred years ago, proscribing the works of Byron and Southey, and the finding by the jury

3. The argument based on the fact that criminal prosecutions under this statute are tried to the jury seems beside the point. The jury must of course find even beyond a reasonable doubt various elements not here involved, such as criminal intent. And courts do not hesitate to dismiss charges when clear that the law has not been violated. See, e. g., United States v. Keller, 3 Cir., 259 F.2d 54. So, too, the contention that judges have no more competence to be literary censors than the Postmaster General, while perhaps true in itself, overlooks the ultimate responsibility of courts to enforce the law and the Constitution.

4. The defense brief states the problem before the District Court in these ab-

solute terms: "Was the dominant theme of the book, considered in the light of the opinion evidence, so innocent that reasonable minds could no longer differ over which inference was the proper one to be adopted?" And then it adds, with considerable understatement: "To state the problem thus is to actually resolve it."

5. L. Hand, J., concurring, Manton, J., dissenting. In literary circles it has been customary to cite or quote the less authoritative decision below by Judge Woolsey in United States v. One Book Called "Ulysses," D.C.S.D.N.Y., 5 F. Supp. 182, because of one or two lilting sentences in the opinion there.

under a charge by Lord Denman that the publication of Shelley's 'Queen Mab' was an indictable offense are a warning to all who have to determine the limits of the field within which authors may exercise themselves." And he went on to this judgment upon a then disputed book now recognized as classic: "We think that Ulysses is a book of originality and sincerity of treatment and that it has not the effect of promoting lust." Here we have one advantage over our predecessors in that the time which has elapsed since the writing and original publication of this book has been sufficient for the crystallization of at least a literary judgment upon it. And it seems clear without dissent from the expert evaluations presented both in the record and in the introductory material to this edition, as well as in the contemporary literature, that this is a major and a distinguished novel, and Lawrence one of the great writers of the era.[6]

■ For present purposes our test must be based upon that prescribed by the majority in Roth v. United States, supra, 354 U.S. 476, 487, 77 S.Ct. 1304, 1310, 1 L.Ed.2d 1498. Justice Brennan said:

"However, sex and obscenity are not synonymous. Obscene material is material which deals with sex in a manner appealing to prurient interest. The portrayal of sex, e. g., in art, literature and scientific works, is not itself sufficient reason to deny material the constitutional protection of freedom of speech and press. Sex, a great and mysterious motive force in human life, has indisputably been a subject of absorbing interest to mankind through the ages; it is

one of the vital problems of human interest and public concern."

And he gave support to the definition in the A.L.I. Model Penal Code thus:

"We perceive no significant difference between the meaning of obscenity developed in the case law and the definition of the A.L.I., Model Penal Code, § 207.10(2) (Tent.Draft No. 6, 1957), viz.:

" ' * * * A thing is obscene if, considered as a whole, its predominant appeal is to prurient interest, i. e., a shameful or morbid interest in nudity, sex, or excretion, and if it goes substantially beyond customary limits of candor in description or representation of such matters. * * *.' See Comment, id., at 10, and the discussion at page 29 et seq."

[5] Examined with care and "considered as a whole," the predominant appeal of "Lady Chatterley's Lover" in our judgment is demonstrably not to "prurient interest," as thus defined. By now the story of the novel is well known. It is thus succinctly summarized in Professor Schorer's Introduction: "Constance Chatterley, the frustrated wife of an aristocratic mine owner who has been wounded in the war and left paralyzed and impotent, is drawn to his game-keeper, the misanthropic son of a miner, becomes pregnant by him, and hopes at the end of the book to be able to divorce her husband and leave her class for a life with the other man." But of course the story is a small part of the work. Actually the book is a polemic against three things which Lawrence hated: the crass industrialization of the English Midlands, the British caste system, and inhibited sex relations between man and woman.

6. This judgment of Messrs. MacLeish, Schorer, Malcolm Cowley, Alfred Kazin, and other competent critics appearing in the record or offered at the departmental hearing seems to be rather regularly and continuously confirmed in literary journals. For example, the reviewer for the Saturday Review, Granville Hicks, in an article entitled, D. H. Lawrence Reconsidered, Saturday Review, Dec. 19, 1959, p. 31, quotes the distinguished English scholar John Middleton Murry as saying shortly before his death in 1957 that "since the end of the Second World War, there has emerged a growing consensus of opinion that he [Lawrence] is the most significant writer of his time." So Professor Harry T. Moore, Lawrence biographer, reviewing this book for the N. Y. Times Book Review Section, May 3, 1959, terms it "our time's most significant romance."

We may not see the close relation he did between the three as instruments of repression of the natural man, but we can understand his plea for greater freedom and naturalness even if we may not share his conviction of the all-inclusive nature of his remedy. Lawrence grew up in the English coal regions as the son of a miner who had married a teacher, and the theme of a relationship between a man of a low social status with a woman of a higher level is one he has used in previous works. The rationale he seeks to establish is thus one surely arguable and open to a writer. And if the aristocratic, but frustrated, heroine is to be taught naturalness in self-expression by her husband's servant, the plot line is rather clearly indicated. It is hardly surprising, therefore, that we find descriptions of increasingly more intimate scenes between the two protagonists and an increasingly greater use of "natural" language as the man's demonstration of naturalness to his feminine partner is stepped up to the author's climax.

What has apparently given surprise over the years—probably less so now than formerly in view of the changing climate of opinion—is the degree or extent to which the author has carried his plan. Undoubtedly to these critics of morals a little description of sex goes a long way; and judging by other examples, classical and modern, less directness would have left the work unchallenged. Obviously a writer can employ various means to achieve the effect he has in mind, and so probably Lawrence could have omitted some of the passages found "smutty" by the Postmaster General and yet have produced an effective work of literature. But clearly it would not have been the book he planned, because for what he had in mind his selection was most effective, as the agitation and success of the book over the years have proven.[7] In these sex descriptions showing how his aristocratic, but frustrated, lady achieved fulfillment and naturalness in her life, he also writes with power and indeed with a moving tenderness which is compelling, once our age-long inhibitions against sex revelations in print have been passed. In actuality his thesis here is only that pressed continuously in the modern marriage-counseling and doctors' books written with apparently quite worthy objectives and advertised steadily in our most sober journals and magazines. Of course it is old in literature; one may recall, for instance, the passionate love scenes between the young tutor and his employer's wife in Stendhal's classic, *Le Rouge et Noir* (The Red and the Black), published in 1830. Actually in present-day literature such descriptions of physical relations appear as regular staples of literary diet and quite without Lawrence's straightforward and somewhat refreshing candor.[8]

 The same is true of the so-called four-letter words found particularly objectionable by the Postmaster General. These appear in the latter portion

7. The defense complains that Lawrence need not "so vividly" have portrayed his scenes of sex and objects to the "Constant repetition of such intimate scenes." But that was at least one way of arousing reader interest, as the careful textual examination by the distinguished government counsel and associate counsel demonstrates. Compare the comment in a somewhat analogous situation of the New York Times Scandinavian reporter Werner Wiskari upon the presently popular Swedish motion picture director Ingmar Bergman, in the Sunday Times Magazine, Dec. 20, 1959, § 6, p. 20: "Why does Bergman insist on such brutality? Because he cannot abide the merely indifferent presence of a popcorn-chewing audience. In creating scenes that are almost physically felt in the midsection, he aims to involve the onlooker in the action so as to win active understanding of the motivations of his characters."

8. As in a recent book of wide popularity in respected book circles, said to have had a sale of nearly three million copies, a tale of continuous seduction of or by a twelve-year-old girl by or with a middle-aged lover; or another, locally nominated for the Nobel prize, depicting in detail the sexual activities, marital and extra-marital, of a middle-aged Pennsylvania lawyer.

of the book in the mouth of the game-keeper in his tutelage of the lady in naturalness and are accepted by her as such. Again this could be taken as an object lesson at least in directness as compared to the smirk of much contemporary usage, which (perhaps strangely) does not seem to have offended our mail-men.[9] In short, all these passages to which the Postmaster General takes exception—in bulk only a portion of the book—are subordinate, but highly useful, elements to the development of the author's central purpose. And that is not prurient.[10] Should a court in reading meaning into the word "obscene"—which proves far from self-defining—make it so all-inclusive as to prohibit a writer from making use of normal and no longer unusual descriptions and parts of English speech to accomplish a worthy objective? And should a mature and sophisticated reading public be kept in blinders because a government official thinks reading certain works of power and literary value is not good for it? We agree with the court below in believing and holding that definitions of obscenity consistent with modern intellectual standards and morals neither require nor permit such a restriction.

Judgment affirmed.

9. As in a humorous book of present popularity, exploiting the lack of a crucial letter of the alphabet from the hero's typewriter; or even that powerful description of a bomber pilot's decline and decay, with the racy language artificially concealed by the ostrichlike method of initial letters followed by blanks.

10. The defense conclusion to the contrary seems to be curiously, if not inconsistently, stated in its brief. It first acknowledges that a book is not obscene "because it expounds the necessity to a happy marriage of sexual fulfillment," or because "it takes the next step and preaches or observes that where sexual fulfillment cannot be found within the marriage the unsatisfied party is justified in looking elsewhere for such physical pleasures," and "Contemporary novels treat of such matters and would not be regarded as obscene." Then it proceeds to condemn the present book as "a tale of the complete denigration of the spiritual aspects of marriage, a steady down-

MOORE, Circuit Judge (concurring in the result).

The subject matter of this case is a book completed in 1928 in Italy. It is significant that it was then published only "for private distribution." For almost thirty years it remained unpublished in this country except for an expurgated edition which enjoyed comparative obscurity. The unexpurgated edition has been barred from the mails since 1928. In 1959, and undoubtedly relying upon the changing "climate" of community standards, plaintiffs (the publisher and the distributor) decided to publish the unexpurgated edition and test the book's "nonmailable" character. Suddenly, with the restoration to the text of "coarse and vulgar" expressions and play-by-play descriptions of extra-marital sexual activities, the book (properly called "this now famous book") becomes "a major and a distinguished novel." Certain critics, apparently for years unconcerned with it absent the vulgarisms and the questionable scenes, now hail the book as a great contribution to our literary heritage.[1] The public, ever anxious to read in print certain words which they can so easily see written in public toilets and other public places,

ward progression throughout the book, the development of a theme by a continuous series of episodes that standing alone cannot be sustained and when linked together to preserve them are fast to a central idea which *itself is certainly lascivious and indecent.*" It is not apparent how these statements are to be reconciled. Is it that Lawrence expresses no adverse moral judgment? That has never been accepted as a sound or workable dividing line in law, though it may have had some vogue in motion picture direction.

1. I do not imply that the views of Jacques Barzun, Edmund Wilson, Archibald Mac-Leish, and other critics mentioned by the majority, *are not entitled to consideration* and respect. My point is simply that literary critics generally do not represent that hypothetical character, the average reader. It is this individual with whom a judge or administrative official must inevitably be concerned.

avidly purchased thousands (probably millions) of copies.

The plot of the book has no bearing on the obscenity issue. Its first two messages (as analyzed by the majority), if they be directed against the "crass industrialization of the English Midlands" and "the British caste system," could be delivered effectively without the objectionable material. The third message of "repression of the natural man," said to be inveighed against by the author, is the "inhibited sex relations between man and woman." Whether "natural man" should be somewhat inhibited in this activity presents a sociological and moral problem thus far not solved by society. If the author wishes to plead "for greater freedom and naturalness" for man and woman in their sexual diversions uninhibited by law or convention, it is for the lawmakers and not the courts to rule how far this objective should properly be pursued.

The fallacy of "the changing climate of opinion" argument is that it rotates in a circle. During recent years authors of the so-called school of "realism" have vied with each other to depict with accuracy all that could be observed by peeking through hypothetical keyholes and by hiding under beds. The last war offered an excellent opportunity to employ the entire register of Anglo-Saxon four-letter words via the medium of realistic soldier conversations. Many such books became best sellers. After this phase of literary effort palled, it became necessary to go beyond this stage into the sordid and more perverted sexual field—all under the guise of telling an allegedly powerful and moving story about various characters or families which had better remained unborn. One normal adultery per book was quite insufficient to create a best seller. And an eager public, possibly bored by the monotony of monogamy, seized upon each literary contribution to enjoy vicariously —and quite safely—bold but rather impractical daydreams of a life which could be found in fictional actuality in these books. Each book contributed a few ad-ditional degrees to the temperature and by its unchallenged existence created the "contemporary community standards" which, in turn, are to justify its acceptance as consistent with such standards. Into this climate ever increasing in warmth came "Lady Chatterley's Lover" which plaintiffs sought to distribute through the mails.

Charged by law with the responsibility of enforcing (initially at least) a statute presumably representing the will of the people, the Postmaster-General adhered to the policy of the Post Office Department for some thirty years and refused to transmit the book and literature relating thereto through the mails. Hearings were duly held and after reviewing various criteria, particularly those mentioned by the Supreme Court in the case of Roth v. United States, 1957, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed. 1498, the Postmaster-General concluded that "The contemporary community standards are not such that this book should be allowed to be transmitted in the mails." [175 F.Supp. 497.]

The applicable statute declares nonmailable every "obscene, lewd, lascivious, indecent, filthy or vile article * * *" (18 U.S.C.A. § 1461). A prohibitory law is not self-enforcing. Although under our governmental system the courts usually have to make final decisions, the Postmaster-General here had to make the first decision. Such a decision, of course, is not beyond judicial review. Any holding of agency finality would be contrary to our fundamental judicial concepts and make of each department head a despot or czar. On this point I am in complete accord with the majority. Nevertheless, the Postmaster-General's findings and conclusions should not be dismissed casually. The Supreme Court (not the Postmaster-General) chose the test of "contemporary community standards" and "appealing to prurient interest." But what "community" and what is "prurient interest"? And is a single judge or a group of judges in any one restricted geographic district all-knowing as to community standards? At least the

Postmaster-General by virtue of his office and his staff of inspectors in every State of the Union is mindful of the type of questionable material found in the mails and the reaction thereto of each community. Parenthetically a conjecture that juries in a substantial number of communities throughout the country would support the Postmaster-General's conclusion in this case would not be too erroneous. As to "prurient interest" one can scarcely be so naive as to believe that the avalanche of sales came about as a result of a sudden desire on the part of the American public to become acquainted with the problems of a professional gamekeeper in the management of an English estate.

The majority, in my opinion, are overly influenced by "the risk run by judges in enforcing obscenity statutes" and believe that "Some of the present Justices of the Supreme Court revolt against all this supervision as violative of constitutional precepts." This obviously is the easiest (and possibly the best) solution. In effect, repeal the statute by judicial failure to enforce it or overrule all decisions as to its constitutionality. Then, at least, the Postmaster-General would be relieved of an unenviable burden and each community could enact such protective ordinances as it might deem best suited to its own standards subject always to constitutional limitations. In substance, literary local option. However, so long as the statute remains upon the books it should be interpreted and enforced according to some standards.

In almost every other field of the law in which neither judge nor administrator boast of any special competence in subjects beyond their knowledge expert testimony is usually required. So here the courts should receive evidence "to allow light to be shed on what those 'contemporary community standards' are." Smith v. State of California, 1959, 361 U.S. 147, 80 S.Ct. 215, 225, 4 L.Ed.2d 205. In coping with a problem difficult at best both as to procedure and proof, the portion of the opinion of Mr. Justice Frankfurter in the Smith case seems particularly apt:

"Their interpretation [the courts' or juries'] ought not to depend solely on the necessarily limited, hit-or-miss, subjective view of what they are believed to be by the individual juror or judge. It bears repetition that the determination of obscenity is for juror or judge not on the basis of his personal upbringing or restricted reflection or particular experience of life, but on the basis of 'contemporary community standards.' Can it be doubted that there is a great difference in what is to be deemed obscene in 1959 compared with what was deemed obscene in 1859. The difference derives from a shift in community feeling regarding what is to be deemed prurient or not prurient by reason of the effects attributable to this or that particular writing. Changes in the intellectual and moral climate of society, in part doubtless due to the views and findings of specialists, afford shifting foundations for the attribution. What may well have been consonant 'with mid-Victorian morals, does not seem to me to answer to the understanding and morality of the present time.' United States v. Kennerley, [D.C.] 209 F. 119, 120. This was the view of Judge Learned Hand decades ago reflecting an atmosphere of propriety much closer to mid-Victorian days than is ours. Unless we disbelieve that the literary, psychological or moral standards of a community can be made fruitful and illuminating subjects of inquiry by those who give their life to such inquiries, it was violative of 'due process,' to exclude the constitutionally relevant evidence proffered in this case. The importance of this type of evidence in prosecutions for obscenity has been impressively attested by the recent debates in the House of Commons dealing with the insertion of such a provision in the enactment of

the Obscene Publications Act, 1959, 7 & 8 Eliz. 2, Ch. 66 (see 597 Parliamentary Debates, H.Comm., col. 1009–1010, 1042–1043; 604 Parliamentary Debates, H.Comm., No. 100 (April 24, 1959), col. 803), as well as by the most considered thinking on this subject in the proposed Model Penal Code of the American Law Institute" (361 U.S. at pages 166, 167, 80 S.Ct. at pages 225, 226, 4 L.Ed.2d 205).

Whether such an approach would satisfy those who, marching under the banner of freedom and tolerance, are themselves often the most intolerant of the views of others, I do not know. Surely this minority group which preaches freedom of the press without restraint would probably not be willing to honor "contemporary community standards" if these differed from their own.

Nor do I find solace in the knowledge and in the thought suggested by the majority that there are other books just as bad. Following the majority's example and referring to the public press "No democratic society has ever yet been able to come up with a foolproof definition of the thin line between liberty and license. One of the weariest cliches in this battle is to point out that there are passages in the Bible and Will Shakespeare that are not for Little Pitchers." (Inez Robb in the New York World-Telegram, December 15, 1959.) Many an advertisement seeking to peddle pornographic material to be sent surreptitiously through the mails offers choice passages from well recognized Greek and Roman authors. But should the literary merit of the product of an author's pen give him carte blanche in case he chooses to venture into forbidden fields? Both the trial court and the majority suggest that the reputations of author and publisher should weigh heavily in deciding the issue. And so they should, were intent involved.[2]

Then there is the doctrine of the "book as a whole" (Parmelee v. United States, 1940, 72 App.D.C. 203, 113 F.2d 729, 737). In other words, if out of some four hundred pages there were three or four pages which clearly are in the "obscene" category, they constitute merely a de minimis one per cent and hence the good overwhelms the bad. The very proposal of such a principle should suffice to demonstrate its impracticability as a test of whether the statute has been violated because obscenity could then parade abroad under the protective cloak of a quantity of innocuous pages.

Another Lawrence[3] is more pessimistic as to the effect of the trial court's decision in saying "So it does look as if the sky is the limit now on the sale and distribution through the mails of pornographic books and pictures." There would seem to be some justification for this prophecy judging by the recent book reviews and an apparent attempt to bring to light hitherto smuggled undercover poems of a well-known poet.

2. A point of view at least entitled to consideration appears in the book review pages of "America," pp. 416–417, June 6, 1959, by Harold C. Gardiner (Father Gardiner), under the title "Good Intentions Can't Justify Results." The reviewer differs with some of the majority's literary critics, saying: "For the book, despite the testimonials solicited from eminent literary figures, is simply not great literature, and that not merely because of the extremely frank passages which, it is charged, make the novel obscene. If the book did not carry the name of Lawrence, no one would bother too much about condemning or defending it." As to motive he adds, "It must be said at the same time, if we are to be fair, that Lawrence, as we know him through his letters, essays and personal life, was not a 'dirty-minded lecher,' as has been charged and will certainly now be repeated." He concedes "that Lawrence's attitudes toward sex were really the result of a fairly well-thought-out philosophy." And believes that "Had he lived in the days of pagan Rome, one feels, Lawrence would have defended the 'liturgical' character of some of the obscene religious rites, and he would have defended them with a religious fervor."

3. David Lawrence, New York Herald Tribune, June 23, 1959.

Unless those who really represent all communities and are best able to speak for their standards, namely, the legislative bodies, take some more definite action the courts will have to continue to struggle with the problem of some vague and ever-retreating boundary line. Certain it is that if the trend continues unabated, by the time some author writes of "Lady Chatterley's Granddaughter," Lady Chatterley herself will seem like a prim and puritanical housewife.

However, this case must be decided in accordance with contemporary judicial standards[4] and therefore I reluctantly concur.

---

4. Sunshine Book Co. v. Summerfield, 1958, 355 U.S. 372, 78 S.Ct. 365, 2 L.Ed. 2d 352; One, Inc. v. Olesen, 1958, 355 U.S. 371, 78 S.Ct. 364, 2 L.Ed.2d 352; Roth v. United States, supra.