818 P.2d 285

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Billy Gilbert CLAIBORNE,
Defendant–Appellant.**

No. 18509.

Supreme Court of Idaho,
Boise, February 1991 Term.

May 8, 1991.

Dissent on Denial of Rehearing
Oct. 29, 1991.

Seiniger, Nevin, Kofoed and Herzfeld, Boise, for defendant-appellant. David Z. Nevin, argued.

Larry J. EchoHawk, Atty. Gen., Michael A. Henderson, Deputy Atty. Gen., Boise, for plaintiff-respondent. Michael A. Henderson, argued.

McDEVITT, Justice.

Billy Gilbert Claiborne was under investigation by the Ada County Sheriff's Department as a result of allegations brought by a twelve-year-old girl and her mother ac-

cusing Claiborne of attempting to entice the girl into performing sexual acts with him. On January 11, 1989, after talking to the young girl and tape-recording a conversation between her and the defendant, Ada County Sheriff's Detective Ken Smith executed an eight page affidavit in support of a search warrant. Based upon this affidavit the magistrate issued two search warrants. The first warrant permitted a search of the defendant's home for the following seven items:

1. sexually explicit letters;
2. purple lace panties;
3. photo album with nude photos of Claiborn [sic] and his wife;
4. sexually explicit magazines;
5. vibrator;
6. box with letters;
7. rose colored lipstick.

The second warrant was for the safe at the defendant's office. A third warrant was issued on January 13, 1989, to search the defendant's home once more. Nothing was seized from the defendant's office, however, numerous items were taken from his home during the execution of the first warrant. One item seized was a book entitled *The Ugly Duckling*, which is the focus of our inquiry.

On January 24, 1989, an Ada County grand jury returned a five-count indictment against the defendant. The first two counts charged him with sexual abuse of the twelve-year-old girl in violation of I.C. § 18–1506. The remaining three counts charged him with possession of sexually exploitative material in violation of I.C. § 18–1507A.

The defendant filed a Motion to Suppress, which sought to suppress the fruits of the searches, specifically naming, among other materials, *The Ugly Duckling*. The district court issued a Memorandum and Order granting in part and denying in part the Motion to Suppress. The district court ruled that some of the items which were not named in the warrant were not proper-

ly seized. As for *The Ugly Duckling*, however, the court found that it was properly seized under the plain view exception.

The parties entered an agreement pursuant to I.C.R. 11(a)(2) with the defendant entering a conditional guilty plea to possession of sexually exploitative material, and reserving the right to appeal the district court's partial denial of his Motion to Suppress. All other charges were dropped and the defendant was sentenced to serve a prison term of one to five years with the court retaining jurisdiction for 120 days pending this appeal.

The issue presented is whether the district court was correct in ruling that *The Ugly Duckling* was properly seized under the plain view exception to the warrant requirement. Our task is to determine where statutorily prohibited materials, as defined by I.C. § 18–1507(2)(j),[1] such as *The Ugly Duckling*, (hereinafter called "sexually exploitative materials") fall on the spectrum of permissible or impermissible seizures. We then must decide when the requirements for the seizure of such materials are met.

The defendant urges that "expressive materials" are entitled to heightened scrutiny and are presumptively protected at the time of the seizure, and that *The Ugly Duckling* qualifies as expressive material.

In order for us to properly address this question, we must begin with a working definition of "expressive materials." As common as this term is, it seems no court has ever set forth its exact meaning. After a careful examination of the cases involving the First Amendment and more specifically, freedom of speech concerns, we have found but fragments of definitions that have proven helpful in our analysis. One case consistently referred to in this area is *Lovell v. City of Griffin, Ga.*, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938), where the United States Supreme Court spoke of "the liberty of the press" and said, "[t]he press in its historic connotation

---

1. "Sexually exploitative material" means any photograph, motion picture, videotape, print, negative, slide, or other mechanically, electronically, or chemically reproduced visual material which depicts a child engaged in, participating in, observing, or being used for explicit sexual conduct.

comprehends every sort of publication *which affords a vehicle of information and opinion." Id.,* 303 U.S. at 452, 58 S.Ct. at 669 (emphasis added). In *Grove Press, Inc. v. Christenberry,* 175 F.Supp. 488 (S.D.N.Y.1959), *aff'd,* 276 F.2d 433 (2d Cir.1960), the court spoke about the importance of the freedom of expression and stated, "[i]t matters not whether ideas be expressed in political pamphlets or works or political, economic or social theory or criticism, or through artistic media. All such expressions must be freely available." *Id.* at 502–03.

From these guidelines, we have distilled the definition of "expressive materials" to mean any medium through which ideas, information, and opinions are expressed, articulated, or made known.

Next we must consider whether *The Ugly Duckling* fits within this definition of "expressive materials." *The Ugly Duckling* is a small paperback book with the title in large print on the cover. On the bottom, in smaller print, are the words:

Pedophilia/Pederasty/The Anal Complex/Completely Photo–Illustrated.

In the center of the cover is a drawing of an adult man sitting on a chair surrounded by four young children. On the back cover are the words:

Pedophilia, Pederasty and the Anal Complex are considered the "ugly ducklings" of Man's sexual nature. Now, for the first time anywhere, F.A. Griffin takes an honest, in-depth look at these three taboos.

Inside is a history of these types of sexual practices in different cultures throughout history. Interspersed throughout the text are illustrations, many of which are explicit photographs of young children engaged in a variety of sexual acts.

■ Arguably, *The Ugly Duckling* can be considered "expressive material" under our definition; it is an expression of ideas and information, however repugnant they may be to the general population. Our next level of inquiry is whether and to what extent it is protected under the United States Constitution.

Within the area of "expressive materials" are subgroups which are treated differently by virtue of their content. One subgroup consists of materials deemed obscene. *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), held that obscenity is not protected by the First Amendment and set forth these guidelines for the trier of fact:

(a) whether "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Miller,* 413 U.S. at 24, 93 S.Ct. at 2615 (citations omitted).

■ Although obscenity is unprotected by the First Amendment, it is still subject to special requirements in the area of searches and seizures because the presumptive protection of "expressive materials" is extended to materials that, at the time of the seizure, have not been conclusively proven to be obscene. The United States Supreme Court stated in *Maryland v. Macon,* 472 U.S. 463, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985):

The First Amendment imposes special constraints on searches for and seizures of presumptively protected material, and requires that the Fourth Amendment be applied with "scrupulous exactitude" in such circumstances. Consequently the Court has imposed particularized rules applicable to searches for and seizures of allegedly obscene films, books and papers.

*Id.,* 472 U.S. at 468, 105 S.Ct. at 2781 (citations omitted).

It is important to keep in mind the reasons for heightened procedural safeguards in the context of seizing "expressive materials." The foundation for this protection lies in the First Amendment. "Expressive materials" have traditionally been afforded more protection in the search and seizure

area because of the danger of prior restraint. In *Fort Wayne Books v. Indiana,* 489 U.S. 46, 109 S.Ct. 916, 103 L.Ed.2d 34 (1989), the United States Supreme Court cited *Maryland v. Macon,* 472 U.S. at 470, 105 S.Ct. at 2782, saying, "[i]t is '[t]he risk of prior restraint, which is the underlying basis for the special Fourth Amendment protections according searches for and seizure of First Amendment materials' that motivates this rule." *Id.,* 489 U.S. at 63–64, 109 S.Ct. at 928.

■ The danger of prior restraint is not present here. The defendant was not in the business of producing or distributing "expressive materials." The police seized one copy of one book that was in the private possession of the defendant. Therefore the danger sought to be avoided by the implementation of heightened procedural safeguards in the area of seizing "expressive materials" is not a concern in this situation.

Another constitutional concern present in the seizure of obscenity is the recognition that it is difficult, if not impossible, for police officers in the field to make a determination that material is obscene at the time of the seizure. The definition of obscenity involves detailed analysis and fact finding by an appropriate trier of fact not capable of being made by the individuals participating in a search and seizure. The definition of sexually exploitative material, by contrast, is much more detailed, and narrowly defined by statute. This difference has been recognized:

> We also note that the difference in constitutional requirements between child protection and obscenity statutes also results in different requirements for an affidavit supporting a warrant ... To pass constitutional muster as unprotected obscenity, a work must appeal to the prurient interest in sex when taken as a whole, must portray sexual conduct in a patently offensive way, and must not, taken as a whole, have serious literary, artistic, political, or scientific value. Although the existence of these characteristics is ultimately a question of fact,
> submitted to a jury, a determination of this "fact" involves complicated knowledge and information far beyond that which is evident from the face of a photograph alone ... In contrast, the constitutional requirements for a child pornography statute are much simpler and more susceptible to credible assertion in an affidavit ... An assertion that certain pictures depict "sexually explicit conduct" prohibited by [the statute] does not require of the affiant extensive knowledge of the prurient interest of the average person, of what portrayals of sexual conduct are patently offensive, or of literary, artistic, political, or scientific criteria for "serious merit." The affiant need only be able to identify the specific, clearly defined acts listed in [the statute]. . . .

*United States v. Smith,* 795 F.2d 841, 848 n. 7 (9th Cir.1986), *cert. denied,* 481 U.S. 1032, 107 S.Ct. 1964, 95 L.Ed.2d 535 (1987), *cert. denied,* 488 U.S. 974, 109 S.Ct. 512, 102 L.Ed.2d 547 (1988) (citations omitted).

Thus, the problem of police making subjective judgments at the time of the seizure is not present in the case of seizing sexually exploitative materials.

The United States Supreme Court carved out another area of "expressive materials" for special treatment with two significant decisions dealing with sexually exploitative material. *New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982), rejected the traditional obscenity standards set forth in *Miller v. California,* as being inapplicable to child pornography, saying that a "trier of fact need not find that the material appeals to the prurient interest of the average person; it is not required that sexual conduct portrayed be done so in a patently offensive manner; and the material at issue need not be considered as a whole." 458 U.S. at 764, 102 S.Ct. at 3359. In *Osborne v. Ohio,* 495 U.S. 103, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990), the Court went further and held that, unlike obscenity, states may prohibit the private possession of child pornography. The states have strong interests in enacting such legislation. In *New York v. Ferber,* 458 U.S. 747,

102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982), the Court wrote:

> It is evident beyond the need for elaboration that a State's interest in "safeguarding the physical and psychological well-being of a minor" is "compelling".... The legislative judgment, as well as the judgment found in relevant literature, is that the use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental health of the child. That judgment, we think, easily passes muster under the First Amendment.

*Id.*, 458 U.S. at 756–58, 102 S.Ct. at 3354–55 (citations omitted).

Other interests were outlined in *Osborne v. Ohio*, 495 U.S. 103, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990):

> First, as *Ferber* recognized, the materials produced by child pornographers permanently record the victim's abuse. The pornography's continued existence causes the child victims continuing harm by haunting the children in years to come. The State's ban on possession and viewing encourages the possessors of these materials to destroy them. Second, encouraging the destruction of these materials is also desirable because evidence suggests that pedophiles use child pornography to seduce other children into sexual activity.

*Id.*, 495 U.S. at 111, 110 S.Ct. at 1697 (citations omitted).

Idaho has seen fit to enact legislation prohibiting the possession of sexually exploitative material which is defined as:

> "Sexually exploitative material" means any photograph, motion picture, videotape, print, negative, slide, or other mechanically, electronically, or chemically reproduced visual material which depicts a child engaged in, participating in, observing, or being used for explicit sexual conduct.

Idaho Code § 18–1507(2)(j).

Idaho Code § 18–1507A, the provision prohibiting the possession of such material, states, in its entirety:

> **Possession of sexually exploitative material for other than a commercial purpose—Penalty.—** (1) It is the policy of the legislature in enacting this section to protect children from the physical and psychological damage caused by their being used in photographic representations of sexual conduct which involves children. It is, therefore, the intent of the legislature to penalize possession of photographic representations of sexual conduct which involves children in order to protect the identity of children who are victimized by involvement in the photographic representations, and to protect children from future involvement in the photographic representations of sexual conduct.
>
> (2) Every person who knowingly and willfully has in his possession any sexually exploitative material as defined in section 18–1507, Idaho Code, for other than a commercial purpose, is guilty of a felony, and shall be punished by imprisonment in the state prison for a period not to exceed five (5) years and by a fine not to exceed five thousand dollars ($5,000).

Because Idaho has chosen to criminalize the possession of sexually exploitative material, *The Ugly Duckling* achieves the status of prohibited material. Although it may fall under the broad definition of "expressive materials," it is at the same time evidence of the crime of possession of sexually exploitative material. This changes the traditional obscenity seizure analysis considerably. When a book is judged to be evidence of a crime, it is seizable with a valid warrant or under one of the exceptions to the warrant requirement just as any other piece of evidence of a crime would be. The United States Supreme Court, in *Fort Wayne Books v. Indiana* stated:

> Most importantly, in *Heller v. New York*, 413 U.S. 483, 492 [93 S.Ct. 2789, 2794, 37 L.Ed.2d 745] (1973), the Court noted that "seizing films to destroy them or to block their distribution or exhibition is a very different matter from seizing a single copy of a film for the *bona fide* purpose of preserving it as evidence in a criminal proceeding" ... The same is obviously true for books or any other expressive

materials. While a single copy of a book or film may be seized and retained for evidentiary purposes based on a finding of probable cause, the publication may not be taken out of circulation completely until there has been a determination of obscenity after an adversary hearing.

*Id.,* 489 U.S. at 83, 109 S.Ct. at 927.

We now must return to our original inquiry of whether or not the plain view exception to the warrant requirement may be applied to the seizure of *The Ugly Duckling* in this case.

The Fourth Amendment to the United States Constitution protects society against unreasonable searches and seizures by requiring a warrant supported by probable cause describing with particularity the place to be searched and the items to be seized. U.S. Const. amend. IV. There are recognized exceptions to the warrant requirement, one of which is the plain view exception. This exception permits the seizure of items not named in the warrant if they meet certain requirements. These requirements were outlined in *Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983):

> First, the officer must lawfully make an "initial intrusion" or otherwise properly be in a position from which he can view a particular area. Second, the officer must discover incriminating evidence "inadvertently," which is to say, he may not "know in advance the location of [certain] evidence and intend to seize it," relying on the plain-view doctrine only as a pretext. Finally, it must be "immediately apparent" to the police that the items they observe may be evidence of a crime, contraband, or otherwise subject to seizure.

*Id.,* 460 U.S. at 737, 103 S.Ct. at 1540–41 (citations omitted).[2]

■ Applying this test to the case at bar, the first prong was satisfied because *The Ugly Duckling* was found during a lawful search while the officers were legitimately in the defendant's home. The sec-

ond prong of the test was satisfied by the fact that the officers discovered the book inadvertently while searching for items named in a valid warrant. In order to satisfy the third prong of the test, we must determine if it was immediately apparent to the officers that *The Ugly Duckling* contained sexually exploitative material in violation of I.C. § 18–1507A.

■ This requirement is met when an officer has probable cause to believe that the item in question is associated with criminal activity. *Texas v. Brown,* 460 U.S. 730, 741–42, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983). This determination may be based on the surrounding facts and circumstances. *State v. Lair,* 95 Wash.2d 706, 712, 630 P.2d 427, 433 (1981). An officer "may draw reasonable inferences based on his training and experience in determining whether a connection exists." *State v. Tamez,* 116 Idaho 945, 946, 782 P.2d 353, 354 (Ct.App.1989). In addition, it is acceptable to look at "the collective knowledge of the officers executing the searches." *United States v. Newton,* 788 F.2d 1392 (8th Cir.1986).

We believe that it was immediately apparent to the officers searching Claiborne's home that *The Ugly Duckling* contained sexually exploitative material. The words on the front cover:

> Pedophilia/Pederasty/The Anal Complex/Completely Photo–Illustrated

and the words on the back cover:

> Pedophilia, Pederasty and the Anal Complex are considered the "ugly ducklings" of Man's sexual nature. Now, for the first time anywhere, F.A. Griffin takes an honest, in-depth look at these three taboos.

alerted officers as to the contents and clearly make it immediately apparent that sexually exploitative material in the form of "Pedophilia ... Photo Illustrated" will be found inside. A cursory glance at the inner contents only serves to confirm that conviction. There are numerous photo-

---

**2.** The second requirement, that the evidence must be discovered "inadvertently" appears to have been eliminated by *Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).

graphs of prepubescent boys and girls engaged in or observing explicit sexual activities with both other children and adults that meet the definition of sexually exploitative material as set forth in I.C. § 18–1507(2)(j).

Thus, because the statute narrowly and specifically defines sexually exploitative material, and because of the lesser constitutional protections afforded this material, officers involved in the search were not required to make a subjective determination regarding the status of sexually exploitative materials. Here, it was immediately apparent to the officers upon viewing the cover of *The Ugly Duckling* that it contained sexually exploitative material.

We hold that all three requirements for a valid plain view seizure were met.

We affirm the district court's ruling that *The Ugly Duckling* was properly seized under the plain view exception to the warrant requirement.

BAKES, C.J., and BOYLE, J. concur.

JOHNSON, Justice, dissenting.

"You can't tell a book by its cover," so an old English proverb tells us. Today, the Court rewrites this proverb to allow a statement on a book's cover to permit a law enforcement officer to seize the book without a warrant. I am unable to join in this opinion. In my view, the plain view doctrine is not applicable to the seizure of a book because of statements on its cover about its contents.

Although the United States Supreme Court has not ruled on this question, in a footnote in *Lo–Ji Sales Inc. v. New York*, 442 U.S. 319, 326 n. 5, 99 S.Ct. 2319, 2324 n. 5, 60 L.Ed.2d 920 (1979) the Court noted that "materials normally may not be seized on the basis of alleged obscenity without a warrant."

In *United States v. Hale*, 784 F.2d 1465 (9th Cir.), *cert. denied* 479 U.S. 829, 107 S.Ct. 110, 93 L.Ed.2d 59 (1986), the Ninth Circuit considered the issue of the seizure of alleged child pornography under the plain view doctrine:

Under Supreme Court and Ninth Circuit precedent, the "First Amendment imposes special constraints on searches for and seizures of presumptively protected material … and requires that the Fourth Amendment be applied with 'scrupulous exactitude' in such circumstances." As we have held, "Because of the First Amendment, the seizure of all publications must meet higher procedural standards than normal."

These "higher procedural standards" take two forms. First, the warrant must specifically describe the material to be seized. Blanket clauses that do not refer to specific items and to material directly related to specific items are not proper bases for constitutional searches and seizures. Second, the exceptions to the warrant requirement are narrowly construed. *The plain view exception argued by the government, for example, cannot be used to search for or seize alleged obscenity or alleged child pornography that is unspecified in the warrant.* Otherwise, police officers could seize any publication or film they deem to be unprotected by the First Amendment, thereby subverting the higher procedural standards that require a neutral magistrate to make the initial determination of probable cause as to specific items. The fact that child pornography is unprotected by the First Amendment is irrelevant. *All expression is presumptively protected at the time of the warrantless seizure; child pornography is no different in this regard from obscenity.*

*Id.* at 1469 (citations omitted) (emphasis added).

The Ninth Circuit has recently noted that to the extent *Hale* stands for the proposition that a stricter probable cause standard should apply when First Amendment values are implicated it has been overruled by *New York v. P.J. Video, Inc.*, 475 U.S. 868, 875, 106 S.Ct. 1610, 1615, 89 L.Ed.2d 871 (1986). *U.S. v. Weber*, 923 F.2d 1338, 1343 n. 6 (9th Cir.1990). *P.J. Video* does not, however, hold that the plain view doctrine applies to the seizure of a publication thought to contain child pornography. In

*P.J. Video,* the Court buttressed its conclusion that a different standard for determining probable cause is not necessary where First Amendment protection is at issue with a reference to "the requirement that the magistrate determine probable cause as a means of safeguarding First Amendment interests." Allowing an officer to make a probable cause determination under the plain view doctrine based on the reading of a book's cover is inconsistent with this view.

The recent decision of the Supreme Court in *Osborne v. Ohio,* 495 U.S. 103, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990) does not undermine the force of the Ninth Circuit's decision in *Hale* rejecting the application of the plain view doctrine to the seizure of alleged child pornography. In *Osborne,* the Court held that a state may constitutionally proscribe the possession and viewing of child pornography. *Osborne* did not purport to deal with the Fourth Amendment question presented in this case. The opinion of the Ohio Supreme Court in *Osborne* reveals that the search and seizure of child pornography there was conducted pursuant to a warrant, not pursuant to the plain view doctrine. *State v. Osborne,* 37 Ohio St.3d 249, 525 N.E.2d 1363, 1372 (1988).

The fact that the cover of *The Ugly Duckling* referred to its being "Completely Photo–Illustrated" should not be considered as a substitute for a warrant issued by a neutral magistrate based on a determination of probable cause. To do so would weaken the presumption that all publications are protected under the First Amendment.

I do not gainsay the right of the state to seek a warrant for the search and seizure of *The Ugly Duckling* based on information provided by the officers who executed the warrant for the search of Claiborne's residence. Nor do I contend that the state could not prosecute Claiborne if the book were seized pursuant to a warrant issued by a magistrate. What I do find erroneous is permitting the seizure of the book without a warrant issued after a determination of probable cause by a magistrate. The application of the plain view doctrine in this case puts law enforcement officers in the position of determining what is entitled to First Amendment protection.

BISTLINE, J., concurs.

BISTLINE, J. dissenting from the denial of the motion for rehearing.

In the Court's initial opinion it was held, erroneously as Justice Johnson's dissenting opinion forcefully demonstrated, that material presumptively protected by the first amendment may be seized without a warrant under the "plain view doctrine." In the petition for rehearing, the Court is asked by respected defense counsel to reconsider whether the facts of this case permit a conclusion that the requirements for a plain view seizure were present. The Court should not be overly quick to eschew this opportunity to reconsider the question. On a proper review, in hindsight, the Court should reach the conclusion that the State failed to carry its burden of proving that the seizure of appellant's copy of *The Ugly Duckling* was constitutionally permissible under the plain view doctrine.

A warrantless search and seizure is presumptively unreasonable. And, although it has been said many times, it is important to remember that it is the prosecutor who bears the burden of proving that a warrantless seizure falls within one of our carefully drawn and jealously guarded exceptions to the warrant requirement. *State v. Bottelson,* 102 Idaho 90, 92, 625 P.2d 1093, 1095 (1981). Here, where the book was seized without the authority of a warrant, it became the State's burden to show the seizure was constitutionally permissible.

The Court cites to *Texas v. Brown,* 460 U.S. 730, 737, 103 S.Ct. 1535, 1540–41, 75 L.Ed.2d 502 (1983), for its statement of the three requirements which are required to establish a valid plain view seizure: 1) a valid initial intrusion into the constitutionally protected area, 2) the officer must inadvertently discover the evidence[1], and 3) that

---

**1.** The United States Supreme Court has eliminated the inadvertence requirement from the

it must be immediately apparent to the police that the object is subject to seizure. A review of the suppression hearing transcript shows the State fell well short of its burden under *Brown.*

On a reading of the appeal record it is immediately observed that the State did not present one single witness at the suppression hearing. It should go without saying that it is certainly difficult, if not impossible, to prove anything without the benefit of evidence. That seemingly indisputable observation is mentioned because the recognition of it has apparently eluded those other members of the Court who comprise the majority. Detective Kenneth Smith was a likely witness for the State, and yet he was called to the witness stand by the defense. Smith testified that he was not present when the police seized *The Ugly Duckling*, but had heard some things about it. To wit:

Q [BY DEFENSE COUNSEL] "Ugly Duckling" and "Sexual Encounter No. 6," Exhibits 3 and 4, were located in the same place, is that correct?

A Yes.

Q Will you describe where that was?

A I personally did not seize those items. They were seized by Detective Bart Hamilton. I have no personal knowledge of where they were seized other than what I was told by Detective Bart Hamilton.

Q Explain what your understanding from Detective Hamilton is.

A In the master closet bedroom, on the floor, in a box. And the box contained

all 40 magazines plus items b1 and b2 listed on the property invoice.[2]

\*     \*     \*     \*     \*     \*

Q Okay. Now was the box closed or open?

A Again, I have no personal knowledge of that.

Q Okay. Has anyone told you?

A No. I don't know.

Q All right. Have you seen the box?

A Not to my recollection.

Q Was there marking on it?

A I have no recollection.

Q You have seen it since it was seized, have you not?

A My recollection is that the box was seized and then we placed it in one of our evidence boxes, and I don't know what the status of the box is, whether it was seized or what. I have no idea.

The State's cross-examination of Detective Smith merely re-established that the book in question was in a box along with 44 other items of legal, albeit erotic, material.

At best, all that one can discern from the record everything in the box was seized without a close examination by the police. The testimony from Detective Smith suggests that the officers did not realize they had seized sexually exploitative material until after the materials already had been taken to the police station. While searching the home the first time, the officers saw numerous videotapes which they felt had suspicious titles. Detective Smith was asked whether the decision to seek another search warrant was motivated only by those titles. He was careful to say that

fourth amendment plain view doctrine. *Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 2304, 110 L.Ed.2d 112 (1990). The search warrant here was executed prior to the issuance of *Horton.* But, where the majority relies on *Brown v. Texas* and does not apply *Horton* to this case, the questions of whether *Horton* will be adopted under Article 1, § 17, and if it is adopted whether it applies retroactively are left for another day.

2. Actually, the inventory list shows that there were twenty-eight magazines seized along with twelve books. Additionally, there were four

films and two empty film containers in the box. Out of these forty-six items seized, only two resulted in an indictment. Other items seized in the search included copies of "Playboy" and "Penthouse" and a copy of *The Art of Sensual Massage.* At a second search of the house, the police seized forty-six videotapes many of which were not sexually explicit or exploitative, including one on taxes, one on how to fly a mini-helicopter, the *Wizard of Oz,* the *Blues Brothers,* several made for T.V. movies and a tape of a family reunion. None of these tapes resulted in an indictment or information being filed against the appellant.

the officers relied on the other items they had seized in the first search.

Upon seeing them [the videotapes at the house], also *upon reviewing the items that we did seize, in reviewing those items,* we did locate items that appeared to be child pornographic, child pornography. (emphasis added)

The implication of Detective Smith's testimony is that it was not readily apparent to the police they had seized sexually exploitative material *until* it was examined at the police station.

Common sense would suggest to anyone that the police properly would not have taken all forty-six items, but not take the box. The box would have been taken, if only for the convenience of handling the other materials. If the detective decided to simply take the box and everything in it back to the police station, it is entirely possible, if not probable, that the contents were not completely examined until after they had been seized. That is, Detective Hamilton could have looked at a few items, which may or may not have included the one in question, and then decided to take everything.

This "seize in haste, examine at leisure" method of police work was certainly in effect at the time of the second search of the house where the seventy-four videotapes were seized without regard for content. There is no reason to believe that the police were any more solicitous of the appellant's first and fourth amendment rights during the first search when the *Ugly Duckling* was seized.

Because it is not at all clear whether the examination, not the seizure, of *The Ugly Duckling* occurred at the home, or later at the station, it is inappropriate for this Court to find that the State carried its burden of proving the search was justified by the plain view doctrine. If the *Ugly Duckling* was not discovered until the contents of the box were examined at the police station, then the seizure could not fall within the plain view exception as the seizure would have already been accom-

plished prior to the time it became readily apparent to the police that *The Ugly Duckling* was sexually exploitative material.

In sum, the Court could conclude that the search was justified by the plain view doctrine, provided however that Detective Hamilton examined the contents of the box while searching for those items listed in the search warrant, and also provided that during the examination he inadvertently saw the book, and it was immediately apparent to him that it was sexually exploitative material as that term is defined in I.C. § 18–1507(2)(j). But the Court could only so urge if Detective Hamilton had testified, which he did not. Appellate courts do not sit to engage in imagination of what might have been proveable; rather, our function is to discern what has or has not been factually proven, and *then* apply pertinent statutory or case precedent and principles of law. Here the State failed to prove that it knew *The Ugly Duckling* was sexually exploitative material before it was seized and taken to the police station. The State has utterly failed to prove its search came within the plain view exception to the warrant requirement. Accordingly, the evidence should have been suppressed, which is so as a matter of law. There are *no* issues of fact discernable in the State's presentation.

The lesson which should be learned today, both by those who comprise the majority and by the officialdom of Garden City, is that police officers are entitled to more education and instruction in the laws attendant to search and seizure. This dissent does not intend to convey the message that the police officers were at fault. Rather it appears that they were untrained and unadvised relative to an undertaking which requires specialized knowledge in a particularized area of criminal law.