848 P.2d 394 (1993)
123 Idaho 394
STATE of Idaho, Plaintiff-Respondent,
v.
George Frank LEWIS, Defendant-Appellant.
No. 18580.
Supreme Court of Idaho, Boise, December 1992 Term.
February 25, 1993.
Rehearing Denied March 30, 1993.
*396 Alan E. Trimming, Ada County Public Defender, and Deborah A. Whipple (argued), Deputy Public Defender, Boise, for defendant-appellant.
Larry EchoHawk, Atty. Gen., and Michael A. Henderson (argued), Deputy Atty. Gen., Boise, for plaintiff-respondent.
McDEVITT, Chief Justice.

NATURE OF THE CASE
Appellant, George Frank Lewis ("Lewis"), was convicted of the crime of lewd conduct with a minor under the age of sixteen, in violation of I.C. § 18-1508. He was sentenced to a fixed term of life in prison. On appeal, Lewis contends that he was tried for the crime of lewd conduct in violation of the Double Jeopardy Clause of the United States Constitution based upon the claim that a previous charge (knowingly transferring a bodily fluid containing the HIV virus, I.C. § 39-608) resulted in a mistrial and, according to Lewis, involved proof of the same conduct. In addition, Lewis contends that the district court erred in delaying his trial, selecting a jury from another county, allowing certain evidence and testimony to be presented to the jury, denying his motion for a new trial, and sentencing him to a fixed term of life in prison. For the reasons set forth below, we affirm the decision of the district court.

BACKGROUND AND PRIOR PROCEEDINGS
On June 11, 1989, a criminal complaint was filed against Lewis. In the complaint, the State alleged that Lewis had committed the crime of lewd conduct with a minor under the age of sixteen, in violation of I.C. § 18-1508. More specifically, the complaint stated that the conduct occurred in February of 1989, with a fifteen-year-old boy and involved the acts of Lewis performing oral sex and attempting to perform anal sex upon the boy, both with the intent to gratify Lewis' sexual desire. After a preliminary hearing held on June 13, 1989, an information was filed against Lewis on June 15, 1989. Lewis was arraigned on the charges and pled not guilty.
On September 19, 1989, the parties appeared at the time set for jury trial by the court. At this hearing, the court advised the parties that trial needed to be reset. Lewis requested a "trial as soon as possible." The court inquired as to certain dates, heard responses, and the parties finally *397 agreed to set trial for November 20, 1989, at 9:00 a.m.
On November 6, 1989, Lewis filed a motion to dismiss the information. Grounds for the motion were: (1) Lewis had been tried for attempting to transfer the HIV virus, "which contained the identical issue as in this matter," and (2) the HIV charge ended in a mistrial, over Lewis' objections, and the State is now collaterally estopped from further proceedings. In support of the motion, Lewis cited "principles of res judicata and the `double jeopardy' clause of the United States Constitution." During oral argument on this motion, counsel for Lewis discussed I.C. § 18-301, a statutory double jeopardy constraint.
On November 7, 1989, the parties again appeared before the court. At the hearing, Lewis withdrew his November 6, 1989 motion to represent himself. In addition, the court discussed its concern about selecting a jury due to publicity, and whether jury selection in a county other than Ada County should be considered. Lewis requested that jury selection be from Ada County. The State requested that the jury be selected from another county. Finally, the court ruled that there be no mention of Lewis being HIV-positive.[1]
On November 17, 1989, Lewis filed a motion in limine and a motion to suppress. Among other things, Lewis asked that the court not allow into evidence a statement made by Lewis to a police officer regarding his sexual preference, a videotape, testimony from an expert witness, and certain property that was seized from his apartment.
On November 20, 1989, the parties met in court for a status conference. At this conference, the court announced its decision to select a jury from another county, to which Lewis objected, stating his desire to go to trial immediately. The court responded that another trial was going on at the time, and it set jury trial for November 28, 1989. Finally, the court heard argument on Lewis' claim of double jeopardy.
Also on November 20, 1989, Marji Shepherd, Ada County Jury Commissioner, filed an affidavit stating that she interviewed seventy-six prospective jurors, asking them questions concerning their ability to be fair and impartial in the Lewis case, as well as their familiarity with Lewis, including the AIDS issue, through the media. In this regard, she stated that forty people said they could not be impartial, thirty-five said they could, and one was undecided. Jury Commissioner Shepherd also stated that, based upon her experience, it would be necessary to call at least 300 prospective jurors in Ada County in order to have a fair and impartial jury for Lewis, and that it would not be possible to sequester 300 prospective jurors.
On November 27, 1989, the court issued its decision on jury selection and Lewis' motion to dismiss. As to jury selection, the court decided to impanel a jury from another county pursuant to I.C. § 19-1816, due to the publicity of Lewis' HIV case, his HIV status not being relevant to this case, and the matters set forth in Jury Commissioner Shepard's affidavit. The court denied Lewis' motion to dismiss. In so doing, the court stated that if Lewis had been acquitted in the HIV case, the State would be collaterally estopped from proceeding in this case. However, since a mistrial was declared and there was no final judgment on whether Lewis and the victim had sexual contact, the court concluded that this prosecution was not barred. In addition, the court noted that I.C. § 39-608, the statute relating to transferring the HIV virus, does not require sexual contact or that the victim be under the age of sixteen.
On November 29, 1989, the parties again met in court to take up motions. At the hearing, Lewis filed an amended motion to *398 suppress. The amended motion to suppress, regarding all videotapes, writings, notes, and letters seized, cited the Fourth Amendment to the United States Constitution and article I, section 17 of the Idaho Constitution, and claimed that probable cause did not exist to support the warrant. Additionally, Lewis filed an affidavit stating that he did not consent to the May 5, 1989, search of his premises. The case proceeded to trial.
On December 5, 1989, the sixth day of jury trial, the jury reached a verdict of guilty.
On January 19, 1990, Lewis filed a motion to reappoint August H. Cahill as defense counsel.[2] He also filed a motion for a new trial pursuant to I.C.R. 34 and I.C. § 19-2406, stating that "[n]ew evidence exists which substantially impeaches the credibility of the state's primary witness...." In support of this motion, Lewis filed an affidavit of Joie Hein. Mr. Hein stated that the victim could not have seen a certain videotape with Lewis on a certain day because Hein had borrowed that tape from Lewis' roommate on the day in question.
On January 29, 1990, a sentencing hearing was held. At the hearing, the court denied Lewis' motion to strike certain evidence in the presentence investigation report, and it sentenced Lewis to a fixed life term in prison.
On February 8, 1990, Lewis' roommate, Michael Carver, filed an affidavit. In his affidavit, Mr. Carver stated that he had lent the above-mentioned videotape to Joie Hein on the day the victim testified that he had watched it with Lewis.
On March 1, 1990, Lewis filed a notice of appeal. He appealed from the January 29, 1990 judgment pursuant to I.A.R. 11(c)(1).
On May 3, 1990, the parties met in court to argue the motion for a new trial. At the hearing, Lewis filed a motion to disqualify the presiding judge, and the parties agreed to continue the matter.
On May 23, 1990, Lewis filed a motion for reconsideration of sentence. The motion was made pursuant to I.C.R. 35.
On June 13, 1990, the court issued its decision and order denying the motion for a new trial. In denying the motion, the court cited State v. Drapeau, 97 Idaho 685, 551 P.2d 972 (1976), for the standard for granting a new trial based upon newly discovered evidence. Applying this standard, the court found, inter alia, that Lewis had not acted with due diligence to discover the new evidence because he had unrestricted access to Mr. Carver and Mr. Hein. In addition, the court found that the jury was properly selected from another county, commenting that there was no way to evaluate whether Boise-area people are more sensitized to gay issues.

ANALYSIS
We address the following issues:
I. Did the district court err in ruling that this case was not barred by the double jeopardy clause of the United States Constitution, U.S. Const. amend. V.
II. Did the district court abuse its discretion by continuing Lewis' trial?
III. Did the district court violate a constitutional right or abuse its discretion by selecting a jury from another county?
IV. Did the district court err in denying Lewis' motion to suppress evidence?
V. Did the district court correctly apply rules of evidence in admitting certain evidence at trial?
VI. Did the district court abuse its discretion by allowing the testimony of an expert witness?
VII. Did the district court abuse its discretion by denying Lewis' motion for a new trial?
VIII. Did the district court abuse its discretion by sentencing Lewis to a fixed term of life in prison?

*399 I.

DID THE DISTRICT COURT ERR IN RULING THAT THIS CASE WAS NOT BARRED BY THE DOUBLE JEOPARDY CLAUSE OF THE UNITED STATES CONSTITUTION, U.S. CONST.AMEND. V?
We hold that the district court did not err in ruling that Lewis' prosecution for the crime of lewd conduct, I.C. § 18-1508 (1984)[3], was not barred by double jeopardy because of his previous prosecution for the crime of transferring the HIV virus, I.C. § 39-608[4], which ended in a sua sponte mistrial.
We begin our analysis of this issue with a review of three United States Supreme Court opinions dealing with double jeopardy.[5] The three United States Supreme Court cases are: Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932); Grady v. Corbin, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990); and United States v. Felix, ___ U.S. ___, 112 S.Ct. 1377, 118 L.Ed.2d 25 (1992).
A. Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932): In Blockburger, the defendant was charged with five counts of violating provisions of the Harrison Narcotic Act, and he was found guilty of the second, third, and fifth counts. The Court explained:
The second count charged a sale on a specified day of ten grains of the drug not in or from the original stamped package; the third count charged a sale on the following day of eight grains of the drug not in or from the original stamped package; the fifth count charged the latter sale also as having been made not in pursuance of a written order of the purchaser as required by the statute.
Blockburger, 284 U.S. at 301, 52 S.Ct. at 181. The relevant federal statutes provided:
It shall be unlawful for any person to purchase, sell, dispense, or distribute any *400 of the aforesaid drugs [opium and other narcotics] except in the original stamped package or from the original stamped package; and the absence of appropriate tax-paid stamps from any of the aforesaid drugs shall be prima facie evidence of a violation of this section by the person in whose possession same may be found....
Blockburger, 284 U.S. at 300 n. 1, 52 S.Ct. at 180-81 n. 1.
It shall be unlawful for any person to sell, barter, exchange, or give away any of the drugs specified in section 691 of this title, except in pursuance of a written order of the person to whom such article is sold, bartered, exchanged, or given on a form to be issued in blank for that purpose by the Commissioner of Internal Revenue.
Blockburger, 284 U.S. at 300 n. 2, 52 S.Ct. at 181 n. 2.
On appeal, the defendant argued that the two sales charged in the second and third counts, having been made to the same person, constituted a single offense. Further, he argued that the fifth count, having been made not from the original stamped package and having been made not in pursuance of a written order, constituted one offense.
As to the defendant's first argument, the Court held that the sales charged in the second and third counts, were "distinct and separate sales made at different times." Blockburger, 284 U.S. at 301, 52 S.Ct. at 181. The Court explained that, although the purchaser paid for the additional quantity shortly after the first quantity was delivered, the first sale had been consummated by its delivery, making "[e]ach of several successive sales constitute[] a distinct offense, however closely they may follow each other." Blockburger, 284 U.S. at 302, 52 S.Ct. at 181.
As to the defendant's second argument, the Court recognized that the above-quoted provisions of the Narcotic Act create "two distinct offenses," one creating a crime of selling any of the drugs unless they are in or from the original stamped package, and the other creating a crime of selling any of the drugs without a written order from the purchaser. Blockburger, 284 U.S. at 303-04, 52 S.Ct. at 182. The Court stated the issue as whether, when there has been one sale, "both sections being violated by the same act, the accused committed two offenses or only one." Blockburger, 284 U.S. at 304, 52 S.Ct. at 182. In concluding that two offenses were committed, the Court held:
Each of the offenses created requires proof of a different element. The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not.... "A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other."
Blockburger, 284 U.S. at 304, 52 S.Ct. at 182 (citations omitted).
B. Grady v. Corbin, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990): In Grady, the defendant drove his vehicle across the double yellow line of the road, striking two oncoming vehicles. The driver of the second vehicle struck by the defendant died later that evening. The defendant was served with two tickets directing him to appear in the local court on a certain date for: (1) driving while intoxicated, a misdemeanor; and (2) failing to keep right of the median. Prior to the defendant's scheduled appearance, an assistant district attorney began to prepare for a homicide prosecution in connection with the accident. The defendant entered guilty pleas to the two traffic tickets, and was given the minimum sentence for these two crimes. There was never any mention of the fatality at either the acceptance of the defendant's guilty pleas or his sentencing hearing.
About two months after the sentencing hearing, a grand jury investigating the accident indicted the defendant, charging him *401 with: (1) reckless manslaughter, (2) second degree vehicular manslaughter, and (3) criminally negligent homicide, all for causing the death of the driver of the second vehicle; (4) third degree reckless assault for causing injury to the passenger of the second vehicle; and (5) driving while intoxicated. Furthermore:
The prosecution filed a bill of particulars that identified the three reckless or negligent acts on which it would rely to prove the homicide and assault charges: (1) operating a motor vehicle on a public highway in an intoxicated condition, (2) failing to keep right of the median, and (3) driving approximately 45 to 50 miles per hour in heavy rain, "which was a speed too fast for the weather and road conditions then pending."
Grady, 495 U.S. at 513-14, 110 S.Ct. at 2089. The defendant moved to dismiss the indictment, arguing that the prosecution would violate statutory and constitutional double jeopardy constraints.
The United States Supreme Court in Grady affirmed the New York Court of Appeals' opinion, which agreed with the defendant's argument. Grady, 495 U.S. at 515, 110 S.Ct. at 2089-90. The Court held that, in addition to the traditional Blockburger test,
[T]he Double Jeopardy Clause bars a subsequent prosecution if, to establish an essential element of an offense charged in that prosecution, the government will prove conduct that constitutes an offense for which the defendant has already been prosecuted.
Grady, 495 U.S. at 510, 110 S.Ct. at 2087 (footnote omitted).[6]
The Grady Court reached its holding by adopting reasoning set forth ten years earlier in Illinois v. Vitale, 447 U.S. 410, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980). It deemed the following analysis to "govern[] this case:"
Like Thomas Corbin, John Vitale allegedly caused a fatal car accident. A police officer at the scene issued Vitale a traffic citation charging him with failure to reduce speed to avoid an accident in violation of § 11-601(a) of the Illinois Vehicle Code. Vitale was convicted of that offense and sentenced to pay a $15 fine. The day after his conviction, the State charged Vitale with two counts of involuntary manslaughter based on his reckless driving. Vitale argued that this subsequent prosecution was barred by the Double Jeopardy Clause.
This Court held that the second prosecution was not barred under the traditional Blockburger test because each offense "require[d] proof of a fact which the other [did] not." See Blockburger, 284 U.S. at 304, 52 S.Ct. at 182. Although involuntary manslaughter required proof of a death, failure to reduce speed did not. Likewise, failure to slow was not a statutory element of involuntary manslaughter. Vitale, 447 U.S. at 418-19, 100 S.Ct. at 2266. Thus, the subsequent prosecution survived the Blockburger test.
But the Court did not stop at that point. Justice White, writing for the Court, added that, even though the two prosecutions did not violate the Blockburger test:
[I]t may be that to sustain its manslaughter case the State may find it necessary to prove a failure to slow or to rely on conduct necessarily involving such failure; it may concede as much prior to trial. In that case, because Vitale has already been convicted for conduct that is a necessary element of the more serious crime for which he has been charged, his claim of double jeopardy would be substantial....
Grady, 495 U.S. at 515-16, 110 S.Ct. at 2090 (citations omitted), quoting Vitale, 447 U.S. at 420, 100 S.Ct. at 2267.[7]
*402 The United States Supreme Court fashioned a two-step double jeopardy analysis: (1) apply the Blockburger test; if the prosecution is not barred under Blockburger, then; (2) apply the Grady test. For the Blockburger test, the inquiry is whether the two or more offenses have "identical statutory elements or that one is a lesser included offense of the other...." Grady, 495 U.S. at 516, 110 S.Ct. at 2090 (emphasis added), citing Brown v. Ohio, 432 U.S. 161, 166, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977). For the Grady test, "[t]he critical inquiry is what conduct the State will prove...." Grady, 495 U.S. at 521, 110 S.Ct. at 2093 (emphasis added).
The Grady Court applied the two-step double jeopardy analysis to the facts of that case. First, it recognized that the defendant conceded that the Blockburger test did not bar the prosecution of the reckless manslaughter, criminally negligent homicide, and third degree reckless assault offenses.[8]Grady, 495 U.S. at 522, 110 S.Ct. at 2094. In applying the second step of the analysis, the Court turned to the prosecution's bill of particulars, which was binding on the State as its theory of proof. Grady, 495 U.S. at 522-23, 110 S.Ct. at 2094, citing Corbin v. Hillery, 74 N.Y.2d 279, 290, 545 N.Y.S.2d 71, 75, 543 N.E.2d 714, 720 (1989), affirmed. The Grady Court quoted from the document, and held that the State admitted that it would prove the entirety of the conduct for which the defendant was convicted. Grady, 495 U.S. at 523, 110 S.Ct. at 2094.
C. United States v. Felix, ___ U.S. ___, 112 S.Ct. 1377, 118 L.Ed.2d 25 (1992): The defendant operated a methamphetamine facility in Beggs, Oklahoma. In July of 1987, DEA agents raided the Beggs facility and shut it down. Subsequently, the defendant ordered materials for manufacturing methamphetamine to be delivered to him in Joplin, Missouri. DEA agents witnessed the Joplin transfer and arrested the defendant shortly thereafter.
The defendant was charged and convicted in Missouri for the crime of attempting to manufacture methamphetamine based upon the Joplin transfer. In the Missouri case, the Felix Court summarized what the government showed:
1. On August 26, 1987, the defendant asked to purchase the materials from a DEA informant;
2. The defendant made a down payment of $7,500 on the materials;
3. The defendant instructed the informant to deliver the materials to a Joplin hotel on August 31, 1987;
4. The informant met the defendant at that hotel on that date with the materials; and,
5. The defendant inspected the materials, hitched his car to the trailer in which the materials had been transported, and then he was arrested.
Felix, ___ U.S. at ___, 112 S.Ct. at 1380.
At the trial in the Missouri case, the defendant disputed that he had the requisite criminal intent. In order to prove his intent, the government introduced evidence that the defendant had manufactured methamphetamine in Oklahoma. The Felix Court summarized this evidence as follows:
1. During the spring of 1987, the defendant had purchased material from the DEA agent for manufacturing methamphetamine;
2. The defendant gave those materials to Paul Roach in exchange for lessons on how to manufacture methamphetamine;
3. Roach testified that he and the defendant had made methamphetamine in a trailer near Beggs, Oklahoma; and,
4. Government agents seized the trailer but did not arrest the defendant, as the defendant avoided arrest by hiding in the nearby woods.
Felix, ___ U.S. at ___, 112 S.Ct. at 1380. The Court admitted this evidence pursuant *403 to F.R.E. 404(b), regarding the defendant's state of mind with respect to the materials.
Subsequently, the defendant was charged and convicted in Oklahoma of one count of conspiracy to manufacture, possess, and distribute methamphetamine and seven substantive counts, four counts relating to manufacturing and possession with intent to distribute, one count relating to maintaining a methamphetamine manufacturing lab, and the last two counts relating to interstate travel with the intent to promote his illegal enterprise. "At trial, the Government introduced much of the same evidence of the Missouri and Oklahoma transactions that had been introduced in the Missouri trial." Felix, ___ U.S. at ___, 112 S.Ct. at 1381.
On appeal to the United States Court of Appeals for the Tenth Circuit, the convictions for conspiracy and the first five substantive counts were reversed based upon the Grady test. The United States Supreme Court reversed the Court of Appeals.
As to the substantive counts, the Felix Court stated that "[t]he actual crimes charged in each case were different in both time and place; there was absolutely no common conduct linking the alleged offenses." Felix, ___ U.S. at ___, 112 S.Ct. at 1382. In this regard:
The Court of Appeals appear[ed] to have acknowledged as much, as it concentrated not on the actual crimes prosecuted in the separate trials, but instead on the type of evidence presented by the Government during the two trials.... Thus, the Court of Appeals holding must rest on an assumption that if the Government offers in evidence in one prosecution acts of misconduct that might ultimately be charged as criminal offenses in a second prosecution, the latter prosecution is barred under the Double Jeopardy Clause.
Felix, ___ U.S. at ___, 112 S.Ct. at 1382. The Felix Court disagreed with this rationale, reiterating that "a mere overlap in proof between two prosecutions does not establish a double jeopardy violation." Felix, ___ U.S. at ___, 112 S.Ct. at 1382. It also pointed to the Grady opinion's disclaimer of adopting a "same evidence" test.[9]Felix, ___ S.Ct. at ___, 112 S.Ct. at 1382, citing Grady, 495 U.S. at 521 n. 12, 110 S.Ct. at 2093 n. 12.

D. Application of the Double Jeopardy Analysis to the Present Case.

1. Jeopardy Attached in Lewis' First Trial: In the HIV case, the jury was impanelled and sworn. "Jeopardy attaches when a jury is sworn." State v. Sharp, *404 104 Idaho 691, 693, 662 P.2d 1135, 1137 (1983), citing Crist v. Bretz, 437 U.S. 28, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978). Jeopardy did attach in Lewis' first trial. We must therefore analyze the issue of whether Lewis was twice placed in jeopardy.
2. The Traditional Blockburger Test: The traditional Blockburger test requires us to examine the elements of each crime and determine whether each crime requires proof of a fact that the other does not. Grady, 495 U.S. at 516, 110 S.Ct. at 2090.
The crime of lewd conduct with a minor or child under sixteen, I.C. § 18-1508 (1984), contains the following elements:
(1a) A lewd or lascivious act committed upon or with the body or a body part of a minor or child under the age of sixteen; or
(1b) Involving a minor or child in any act of bestiality or sadomasochistic abuse or lewd exhibition, as defined in I.C. § 18-1507; and
(2) Intent to arouse, appeal to, or gratify the lust, passions, or sexual desires of the defendant or victim.
The crime of transferring a body fluid which may contain the HIV virus, I.C. § 39-608, contains the following elements:
(1a) Expose another person in any manner with the intent to infect; or
(1b) With defendant's knowledge that he or she has been afflicted with acquired immunodeficiency syndrome (AIDS), AIDS related complexes (ARC), or other manifestations of human immunodeficiency virus (HIV); and
(2) A transfer or attempted transfer of body fluid, tissue, or organs to another person.
I.C. § 39-608(1). The statute goes on to define "body fluid" as, among other things, semen, I.C. § 39-608(2)(a), and "transfer" as including, among other modes sexual and otherwise, anal-genital contact, I.C. § 39-608(2)(b). Finally, consent and medical advice are defenses to I.C. § 39-608(1). I.C. § 39-608(3)(a).
It is clear from our examination of the statutory elements of each crime that the Blockburger test is satisfied. In order to prove a violation of the HIV offense, it is not necessary to prove that the victim is under the age of sixteen, that the defendant had an intent to arouse, appeal to, or gratify his or her, or the victim's, lust, passions, or sexual desires  all of which are elements of the lewd conduct crime. In order to prove a violation of the lewd conduct statute, it is not necessary to prove that the defendant had an intent to infect the victim or expose the victim with knowledge of his or her HIV status, or that any body fluid, tissue, or organ was transferred to the victim  all of which are elements of the HIV crime. Therefore, we hold that the traditional Blockburger test, which focuses upon the elements of each crime, is satisfied in this case.
3. The Grady Test: The second part of the double jeopardy analysis requires us to focus upon the conduct which the State intended to prove in the HIV case and the conduct it proved at the lewd conduct trial.[10]Grady, 495 U.S. at 521, 110 S.Ct. at 2093.
In the lewd conduct case, the State alleged the following: (1) during February of 1989, the defendant committed a lewd and lascivious act upon the body of the victim; (2) the victim was under the age of sixteen years old; and (3) the defendant had the intent to gratify his sexual desire.
In the HIV case, the indictment read:
GEORGE FRANK LEWIS is accused by the Grand Jury of Ada County by this Indictment, of the crime of KNOWINGLY ATTEMPTING TO TRANSFER BODY FLUIDS WHICH MAY CONTAIN THE HIV VIRUS, I.C. § 39-608 committed as follows:
That the defendant, GEORGE FRANK LEWIS, on or about February, 1989, in the County of Ada, State of Idaho, did attempt to transfer his body fluids to another person, knowing that he has been afflicted with the Acquired Immunodeficiency Syndrome (AIDS), AIDS related complexes (ARC), or other manifestations of the Human Immunodeficiency Virus, to wit: attempting to anal penetrate *405 [the victim] with his penis, with the intent to gratify the sexual desires of the defendant, by passing semen onto or into [the victim's] body.
. . . . .
While the State may have introduced evidence in the lewd conduct case that it would have introduced in the HIV case, it is clear that "a mere overlap in proof between two prosecutions does not establish a double jeopardy violation." Felix, ___ U.S. at ___, 112 S.Ct. at 1382. Instead, the Grady test looks only to "what conduct the State will prove, not the evidence the State will use to prove that conduct." Grady, 495 U.S. at 521, 110 S.Ct. at 2093 (emphasis added). Although the HIV charge and the lewd conduct charge may have arisen at or near the same time and place, the Grady test is not a "same transaction" test. Felix, ___ U.S. at ___, 112 S.Ct. at 1385; Grady, 495 U.S. at 523 n. 15, 110 S.Ct. at 2094 n. 15. Further, "it is clear that when two crimes arise from the same sequence of events, such is not sufficient to invoke the protection of I.C. § 18-301."[11]State v. Chapman, 112 Idaho 1011, 1013, 739 P.2d 310, 312 (1987).
In establishing the essential elements of the lewd conduct charge, the State introduced evidence that Lewis' conduct consisted of anal-genital or oral-genital contact with an under sixteen-year-old victim and that Lewis or the victim had the intent to arouse, appeal to, or gratify their lust, passions, or sexual desires. This conduct does not constitute a violation of the HIV offense because the State did not produce evidence of Lewis' conduct as a knowing carrier of HIV. Therefore, the lewd conduct prosecution was not barred by double jeopardy.[12]

II.

DID THE DISTRICT COURT ABUSE ITS DISCRETION BY CONTINUING LEWIS' TRIAL?
We hold that the district court did not abuse its discretion by continuing Lewis' trial until December 29, 1989.
At the hearing on September 19, 1989, the district court suggested a trial date of December 5, to which Lewis' counsel responded that, "I would certainly object to that late of a setting." The parties and the court discussed alternate dates to set the trial, and ultimately agreed upon November 20, 1989, Lewis' counsel stating, "That would be fine with me, Judge." Lewis had filed several motions, including a motion to dismiss that was set for hearing on November 20, 1989, at 1:30. At the hearing on November 20, 1989, the court noted that Lewis' motions, which had not yet been heard and decided, were filed late. Yet, Lewis' counsel did "object[] to another change of date." However, at the November 7, 1989 hearing, the parties and court agreed to begin jury selection on November 21, 1989. The trial ultimately began on November 29, 1989.
Idaho Code § 19-3501 provides, in relevant part:
19-3501. When action may be dismissed. The court, unless good cause to the contrary is shown, must order the prosecution or indictment to be dismissed, in the following cases:
. . . . .
2. If a defendant, whose trial has not been postponed upon his application, is not brought to trial within six (6) months *406 from the date that the indictment or information is filed with the court.
Thus, the district court has discretion in determining whether "good cause" exists to justify a continuance in the trial. In re Rash, 64 Idaho 521, 526, 134 P.2d 420, 421-22 (1943). Whenever this Court is faced with an appeal from a discretionary determination, we ask three questions:
(1) whether the trial court correctly perceived the issue as one of discretion; (2) whether the trial court acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and (3) whether the trial court reached its decision by an exercise of reason.
Sun Valley Shopping Ctr., Inc. v. Idaho Power Co., 119 Idaho 87, 94, 803 P.2d 993, 1000 (1991), citing State v. Hedger, 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989).
In this case, the record clearly shows that the district court correctly understood this issue to be one of discretion. Further, the record shows that the decision was made within the confines of its discretion and consistent with the applicable legal standards. First, the length of the continuance was about two and one-half months (from the original date of September 19, 1989, to the ultimate date of November 29, 1989) and the trial began within six months of the filing of the criminal information (June 15, 1989); second, the basis for the continuance (that "another trial was going on ...") was an adequate reason. State v. Talmage, 104 Idaho 249, 251, 658 P.2d 920, 922 (1983), citing Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Finally, the record shows that the district court reached its decision to continue the trial until November 29th by an exercise of reason.

III.

DID THE DISTRICT COURT VIOLATE A CONSTITUTIONAL RIGHT OR ABUSE ITS DISCRETION BY SELECTING A JURY FROM ANOTHER COUNTY?
We hold that the district court did not violate a constitutional right or abuse its discretion by selecting a jury from another county to sit in the lewd conduct case.
Idaho Code § 19-1816, which was first enacted in 1983, provides, in relevant part:
19-1816. Impaneling jury from another county. (a) As an alternative to entering the order of removal provided in the preceding sections of this chapter, the court may instead enter an order directing that jurors be impaneled from the county to which venue would otherwise have been transferred, if it finds:
1. That a fair and impartial jury cannot be impaneled in the county where the criminal complaint, information or indictment is filed;
2. That it would be more economical to transport the jury than to transport the pending action; and
3. That justice will be served thereby.
. . . . .
Lewis contends that I.C. § 19-1816 does not empower a district court, on its own motion, to order selection of a jury from another county, and that the district court, in this case, did order the change in jury selection upon its own motion. For authority, Lewis points to I.C. §§ 19-1801 and 19-1808, which require motion by the defendant or the State, respectively, in order to effect a change of venue, and to I.C.R. 21, which provides for change of venue upon motion by the defendant or the State, and cites State v. Ash, 94 Idaho 542, 493 P.2d 701 (1972), wherein this Court ruled it improper for a district court to change venue pursuant to I.C. § 19-1801 on its own motion. We conclude that the State did move for the change of jury selection.
At the November 7, 1989 hearing, the district court identified the following issues to be discussed: (1) Lewis representing himself; (2) the publicity of the case and consideration of impaneling a jury from another county; and (3) consideration of a jury questionnaire. During the discussion of the jury selection issue, the State asserted *407 that "a change of venue is appropriate in terms of selecting a jury." The State therefore requested the court to select a jury from another county.

IV.

DID THE DISTRICT COURT ERR IN DENYING LEWIS' MOTION TO SUPPRESS EVIDENCE?
We hold that the district court did not err in admitting into evidence certain photographs and the document entitled "And Then There Was James," both of which Lewis moved to suppress.
The search warrant issued by the magistrate authorized Detective Armstrong to search for the following:
[C]ertain evidence of a crime, to wit: pornographic VCR tape entitled "Boys On Film;" another pornographic VCR tape untitled containing adults of both sexes engaging in sexual acts; lists of names of past, present or potential victims; memorabilia of victims including photos, clothing, or other personal items; a diary listing names of victims and activities engaged in; camera and VCR recording equipment; correspondence with victims; indicia of ownership or occupance of Apt 14, 2701 Rosehill, Boise.
In support of his request for a search warrant, Detective Armstrong signed an affidavit which detailed his experience (seventeen years) as a law enforcement officer, his experience (thirteen years) and training in the investigation of crimes involving the sexual abuse of children, including identifying adults who sexually abuse children, and the events that had taken place in the Lewis investigation. In addition, Detective Armstrong stated:
Your affiant knows from his experience and training that pedophiles or adults who habitually seek sex with children usually keep records or diaries, listing their sexual partners' names and the activities engaged in. That these offenders usually keep pictures of their sexual victims, or keep items belonging to their victims in order to recall the sex acts with those children. These offenders often write out plans involving future victims, and correspond via letters with victims.
The district court ruled that the affidavit was sufficient and that the material was properly seized.
When we review the issuance of a search warrant by a magistrate, our review is limited to ensuring that the magistrate had a substantial basis for concluding that probable cause existed, and we give great deference to the magistrate's determination. State v. Lang, 105 Idaho 683, 684, 672 P.2d 561, 562 (1983). Looking to the language of the affidavit of Detective Armstrong, we hold that there was a substantial basis that probable cause existed for the issuance of the warrant. Furthermore, it is clear from our review of the record that the photographs and document fell within the scope of the warrant. The photographs, which depict, inter alia, scantily clad young men and homosexual acts, fall within the provision of the warrant providing for the search of "memorabilia of victims including photos, clothing, or other personal items." (Emphasis added.) The document, which was written in the first person and regarded homosexual acts between the writer and a person who had the "unworried look of a fifteen-year-old," was properly seized pursuant to the "memorabilia" and "diary" provisions of the warrant. Although it is clearly "expressive material," "it is seizable with a valid warrant or under one of the exceptions to the warrant requirement just as any other piece of evidence of a crime would be." State v. Claiborne, 120 Idaho 581, 585, 818 P.2d 285, 289 (1991).
The search was lawful. The search warrant authorized the officers to enter Lewis' apartment and conduct a search for various items, including memorabilia and diaries.[13]

*408 V.

DID THE DISTRICT COURT CORRECTLY APPLY RULES OF EVIDENCE IN ADMITTING CERTAIN EVIDENCE AT TRIAL?
We hold that the district court did not abuse its discretion by admitting certain evidence at trial.
On appeal, Lewis claims that the court should not have admitted the following evidence pursuant to I.R.E. 404(b): (1) testimony from Detective Larry Armstrong regarding Lewis' statement that he had a sexual preference for young boys; (2) the videotape entitled "Boys On Film;" (3) a document entitled "And Then There Was James;" and (4) uncharged sexual misconduct with the alleged victim prior to the charged misconduct.
Rule 404(b) of the Idaho Rules of Evidence provides:
(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
Relevant evidence is admissible, I.R.E. 402, but is to be weighed against its prejudicial impact, confusion of the issues, or misleading the jury, or by undue delay, waste of time, or cumulative effect, I.R.E. 403.
A. Detective Armstrong's Testimony: During the State's direct examination, Detective Armstrong testified:
I asked Mr. Lewis if he didn't have a sexual preference for adolescent boys, and he responded, "Yeah, but that doesn't mean I have to take advantage of the situation."
At the time this statement was offered, Lewis objected on the basis of foundation, order of proof, and "opening the door" to prior convictions. The district court ruled that there was a proper foundation laid for the testimony, and that it was relevant and admissible. Lewis did not object to this testimony as violative of I.R.E. 404(b). Our review of the record satisfies us that the court correctly applied the rules of evidence in admitting this testimony.
B. The Video "Boys On Film:" The victim testified that he and Lewis watched a portion of this video on the day in question. During pre-trial motions, Lewis argued that the only issue was whether the victim really saw the film, and that the jury did not need to see it. Lewis did not object to it as being violative of I.R.E. 404(b). The court ruled that the film tended to corroborate the victim's account of the crime, but it reserved ruling on whether the jury could view the film. The record does not reveal that the court ruled that the jury could view it. The court correctly applied the rules of evidence.
C. The Document "And Then There Was James:" Detective Armstrong testified that he perceived the document to be indicia of pedophilia. At the time it was offered, Lewis objected to Detective Armstrong's testimony based upon the document not then being admitted. The court then admitted it, ruling that a proper foundation had been laid. The court properly applied the rules of evidence.
D. Prior Uncharged Sexual Contact With The Victim: The victim testified regarding earlier uncharged sexual acts between himself and Lewis. During pretrial motions, Lewis objected to this testimony as violative of I.R.E. 404. The State contends that the testimony was properly admitted as proof of Lewis' plan to groom the victim for sexual purposes.
We have recently analyzed evidence of prior uncharged sexual misconduct between a defendant and his victims in State v. Tolman, 121 Idaho 899, 828 P.2d 1304 (1992). In this regard, we focused upon whether the testimony revealed a common scheme or plan to sexually abuse an identifiable group and comparing that to the victim and the circumstances surrounding the victim's allegations. Tolman, 121 Idaho at 905, 828 P.2d at 1310. In addition, we stated that testimony of prior sexual *409 misconduct is admissible where the parties' credibility is at issue. Tolman, 121 Idaho at 904, 828 P.2d at 1309.
In this case, the victim testified that he and Lewis engaged in sexual acts a few weeks before the acts in question in this case. The testimony revealed that during two trips the two of them took to Idaho City, Idaho, and to Lowman, Idaho, they engaged in oral sex, and Lewis tried to ease the victim's conscience by telling him that "everybody does it." Lewis did not testify at trial. Essentially, then, his defense was that the alleged acts did not occur. "This type of posture at trial places the credibility of the victim squarely in issue for the jury to decide." State v. Phillips, 123 Idaho 178, 181, 845 P.2d 1211, 1214 (1993). When the alleged conduct in this case is considered with the victim's testimony regarding prior sexual misconduct with Lewis, "the jury was better able to compare patterns and methods, details and generalities, consistencies and discrepancies, and thereby ma[k]e a more meaningful and accurate assessment of the parties' credibility." Tolman, 121 Idaho at 905, 828 P.2d at 1310. Our review of the record satisfies us that the district court properly admitted this testimony in conformity with the rules of evidence.

VI.

DID THE DISTRICT COURT ABUSE ITS DISCRETION BY ALLOWING THE TESTIMONY OF AN EXPERT WITNESS?
We hold that the district court did not abuse its discretion by allowing the testimony of Dr. James Oyler, a psychologist who had treated the victim after the crime.
Lewis argues that Dr. Oyler invaded the jury's province by offering his opinion that the victim was truthful in his claim that Lewis had sexually abused him. This argument is flawed for two reasons: (1) the record reveals that Dr. Oyler did not testify that it was his opinion that the victim was telling the truth; and (2) the dialogue where this statement is supposed to have been made was during Lewis' cross-examination of Dr. Oyler, during which Lewis tried unsuccessfully to get Dr. Oyler to express his opinion on the victim's truthfulness.
Idaho Rule of Evidence 702 guides the admission of expert testimony. It provides:
Rule 702. Testimony by experts. If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Furthermore, "[i]t is within the discretion of the district court to determine whether a person is qualified to testify as an expert witness." State v. Thomasson, 122 Idaho 172, 175, 832 P.2d 743, 746 (1992), citing State v. Rodgers, 119 Idaho 1047, 1051, 812 P.2d 1208, 1212 (1991). In this case, Dr. Oyler testified that he was a psychologist licensed to practice in the State of Idaho. He was educated at Idaho State University and received a master's degree in clinical psychology in San Francisco, California. He detailed his work experience in psychology, including his involvement in therapeutic intervention with minors who were victims of sexual abuse and people involved in homosexual issues. He further testified as to his therapeutic relationship with the victim, including his opinion that the victim fit the profile of a sexual abuse victim. Given Dr. Oyler's qualifications and experience, as set forth in the foundation laid for his testimony, we cannot say that the district court abused its discretion by allowing him to testify regarding whether the victim fit the profile of a sexual abuse victim. If a proper foundation has been laid, it is proper for the expert to testify regarding whether a person has been sexually abused. State v. Hester, 114 Idaho 688, 692-93, 760 P.2d 27, 31-32 (1988).

VII.

DID THE DISTRICT COURT ABUSE ITS DISCRETION BY DENYING LEWIS' MOTION FOR A NEW TRIAL?
We hold that the district court did not abuse its discretion by denying Lewis' motion for a new trial.
*410 The decision to grant a new trial rests in the sound discretion of the district court. State v. Lankford, 116 Idaho 860, 873, 781 P.2d 197, 1010 (1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3295, 111 L.Ed.2d 803 (1990).
Lewis' motion for a new trial was based upon Michael Carver's and Joie Hein's statements concerning the whereabouts of a videotape on the day the alleged conduct occurred between Lewis and the victim. The victim testified that he had watched certain portions of the videotape with Lewis on this day. Subsequent to the trial, Carver and Hein signed affidavits stating that Carver, who was Lewis' roommate, had loaned the videotape in question to Hein, and Hein was still in possession of it on the day the victim testified that he had watched it with Lewis. The district court ruled this evidence to be newly discovered evidence, and concluded that the motion be denied pursuant to the standard set forth in State v. Drapeau, 97 Idaho 685, 551 P.2d 972 (1976).
The Drapeau standard, which applies to motions for new trials based upon newly discovered evidence, is: (1) the evidence was unknown to the defendant at the time of trial; (2) the evidence is material, not merely cumulative or impeaching; (3) it will probably produce an acquittal; and (4) failure to learn of it was due to no lack of diligence on the part of the defendant. Drapeau, 97 Idaho at 691, 551 P.2d at 978. The trial court ruled that the evidence was merely impeaching evidence, that it probably would not produce an acquittal, and that failure to learn of it was due to a lack of diligence on Lewis' part. As to the diligence question, the court found that while Lewis was in jail prior to the trial, Carver visited Lewis forty-five times, and Hein visited Lewis ten times, and that both Carver and Hein were frequently at the courthouse proceedings relating to Lewis. The record shows that the court perceived this issue as a discretionary determination, that it correctly applied the proper analysis, and reached its decision through an exercise of reason.

VIII.

DID THE DISTRICT COURT ABUSE ITS DISCRETION BY SENTENCING LEWIS TO A FIXED TERM OF LIFE IN PRISON?
We hold that the district court did not abuse its discretion by sentencing Lewis to a fixed term of life in prison. In other words, the sentence imposed by the district court is reasonable.
Our standard in reviewing sentences is:
Sentencing is a matter committed to the discretion of the trial judge, and the defendant has the burden of showing a clear abuse thereof on appeal. In exercising that discretion, reasonableness is a fundamental requirement.
State v. Broadhead, 120 Idaho 141, 144, 814 P.2d 401, 404 (1991), overruled on other grounds; State v. Brown, 121 Idaho 385, 394, 825 P.2d 482, 491 (1992), citing State v. Dillon, 100 Idaho 723, 724, 604 P.2d 737, 738 (1979).
Lewis' burden is to "show that in light of the governing criteria, [his] sentence was excessive under any reasonable view of the facts." Broadhead, 120 Idaho at 145, 814 P.2d at 405, quoting State v. Small, 107 Idaho 504, 505, 690 P.2d 1336, 1337 (1984). Thus, in order for this Court to conclude that Lewis' fixed life sentence is unreasonable, we must be convinced that the sentence was excessive under any reasonable view of the facts, considering (1) the protection of society, (2) deterrence of Lewis and others, (3) the possibility of Lewis' rehabilitation, and (4) punishment or retribution for Lewis. Broadhead, 120 Idaho at 146, 814 P.2d at 406.
The record reveals that Lewis has previously been convicted for a sexual offense against a minor in 1979 in Nashville, Tennessee. Also, Lewis was HIV-positive at the time of the acts for which he was convicted in the present case. Further, there were several allegations of uncharged sexual misconduct between Lewis and minors during the sentencing proceedings. Finally, Lewis continues to deny that he committed this crime. Based upon the information before it, the district court *411 stated that this was the "most aggravated case [it has] seen." It considered the objectives of sentencing, and concluded that "the protection of society does warrant the penalty of life in prison without possibility of parole." Based upon the record, we hold that the sentence imposed by the district court was not excessive under any reasonable view of the facts.

CONCLUSION
For the foregoing reasons, the judgment of conviction and the sentence imposed by the district court are affirmed.
JOHNSON and TROUT, JJ., and REINHARDT, J., Pro Tem., concur.
BISTLINE, Justice, concurring in Parts II, V(B) and (C), and VIII, dissenting from the remainder.
"Drunk driving is a national tragedy. Prosecutors' offices are often overworked and may not always have the time to monitor seemingly minor cases as they wind through the judicial system. But these facts cannot excuse the need for scrupulous adherence to our constitutional principles." Grady v. Corbin, 495 U.S. 508, 524, 110 S.Ct. 2084, 2095, 109 L.Ed.2d 548 (1990). Thus spoke the United States Supreme Court in Grady, a case with which the majority deals extensively. Child molestation is in some ways more of a national tragedy than drunk driving. Also, let it be noted that Lewis is hardly a sympathetic defendant. In forcing his will on someone too young to be able to consent to sex, he also tried to engage in a course of conduct that, if successful, could potentially have exposed his young victim to a deadly virus. It is crucial to recall, however, that this Court must not decide its criminal cases based upon the character of the accused, as difficult as that may sometimes be to disregard. Instead, we must decide our cases based on the law. Because the majority, for whatever reason, disregards aspects of the proceedings against Lewis that are blatantly contrary to the relevant constitutional, statutory and case law, I cannot concur in much of the majority opinion.

I. The Lewd and Lascivious Prosecution Against Lewis Is Barred by the Double Jeopardy Clause.
The majority's discussion of the law of double jeopardy is both cogent and complete, but its analysis of the facts sub judice and its application of the law to those facts are neither. The majority opinion attempts to apply the relevant precedent of Grady to Lewis's case in a three-sentence paragraph, to-wit:
In establishing the essential elements of the lewd conduct charge, the State introduced evidence that Lewis' conduct consisted of anal-genital or oral-genital contact with an under sixteen year old victim and that Lewis or the victim had the intent to arouse, appeal to, or gratify their lust, passions, or sexual desires. This conduct does not constitute a violation of the HIV offense because the State did not produce evidence of Lewis' conduct as a knowing carrier of HIV. Therefore, the lewd conduct prosecution was not barred by double jeopardy.
State v. Lewis, at 405 (emphasis omitted). The Court summarily concludes that double jeopardy does not bar the lewd and lascivious prosecution since Lewis's "conduct does not constitute a violation of the HIV offense because the State did not produce evidence of Lewis' conduct as a knowing carrier of HIV." Id. (emphasis added). This conclusion is not only wholly unsupported by meaningful analysis, but it also blatantly disregards the same opinion's preceding legal analysis. The majority thereby engages in an alchemic attempt to convert evidence of an element of a crime into conduct.
By analyzing the evidence involved rather than the conduct, the majority opinion defies the dictates of Grady. As the majority explains, Grady requires analysis of the defendant's conduct to determine whether an accused is being punished twice for the same offense, holding that "the Double Jeopardy Clause bars a subsequent prosecution if, to establish an essential element of an offense charged in that prosecution, the government will prove conduct that constitutes an offense for which the *412 defendant has already been prosecuted." 495 U.S. at 510, 110 S.Ct. at 2087 (emphasis added). Grady later specifically asserts that "[t]his is not an `actual evidence' or `same evidence' test. The critical inquiry is what conduct the State will prove, not the evidence the State will use to prove that conduct." 495 U.S. at 521, 110 S.Ct. at 2093 (emphasis added).
To demonstrate the majority's error, it is necessary to delineate precisely what conduct is at issue in the two prosecutions. It is first noted that the indictment which laid the HIV charge states,
Lewis, on or about February, 1989, ... did attempt to transfer his body fluids to another person, knowing that he has been afflicted with the Acquired Immunodeficiency Syndrome (AIDS), AIDS related complexes (ARC), or other manifestations of the Human Immunodeficiency Virus, to-wit: attempting to anally penetrate [the victim] with his penis, with the intent to gratify the sexual desires of the defendant, by passing seman [sic] onto or into [the victim's] body.
Thus, the first prosecution alleged that Lewis attempted anal-genital contact.[14] The subsequent prosecution, initiated by complaint and information, charged Lewis with the crime of lewd and lascivious conduct in that "Lewis, on or about February, 1989, ... did, ... commit a lewd and lascivious act upon the body of a minor, ... to-wit: of the age of 15 years, by placing his mouth on [the victim]'s penis and by attempting to anally penetrate [the victim] with his penis, with the intent to gratify the sexual desire of the defendant."[15]
The question then becomes what constitutes "conduct." Although the majority opinion does not state as much, its careless reference to conduct would seem to embrace not only the oral-genital contact and the attempted anal-genital contact, but also the victim's age, Lewis's and/or the victim's intent, and Lewis's HIV-positive status. How these latter facts fit into the definition of "conduct" is not readily understood. Webster defines "conduct" as, inter alia, a noun meaning "1. The way a person acts: BEHAVIOR." Webster's II New Riverside University Dictionary 295-296 (1984). Black's Law Dictionary similarly defines the word: "Personal behavior; deportment; mode of action; any positive or negative act." Black's Law Dictionary 268 (5th ed. 1979). Hence, "conduct" means a course of physical action. Assuming that the members of the United States Supreme Court, all of whom signed on to the relevant portion of Felix, know the dictionary meaning of the word "conduct" (and that is a safe assumption), "conduct" does not mean the defendant's status nor state of mind, nor the victim's age.
The majority's implicit analysis of what constitutes Lewis's conduct also fails because its presumed definition is no more than a re-application of the Blockburger *413 test, as Lewis pointed out. Whether Lewis was a knowing carrier of HIV or whether Lewis possessed the requisite intent to gratify his desires on a fifteen year old are elements of the two crimes, not "conduct." It is the Blockburger test, not the Grady test, which looks to the elements of the two charged crimes. No quarrel can be made with the majority opinion's statement that the Lewis prosecutions fail to satisfy the Blockburger inquiry and thus that the subsequent prosecution is not barred under that theory. But the Supreme Court intended the Grady inquiry as separate and additional to the Blockburger inquiry. In including these elements in its Grady inquiry under the guise of "conduct," the majority does little justice to United States Supreme Court precedent.
The majority appears to have accepted the State's contention, advanced in oral argument, that a passage in Grady indicates that Grady's rationale would only bar the second prosecution if the prosecution alleged that Lewis was HIV-infected. The theory by which the State reaches this conclusion is seductively clever but ultimately unpersuasive. The Grady dicta which the State points to discusses what sort of prosecution would have been acceptable in regard to Corbin, the defendant in Grady:
By its own pleadings, the State has admitted that it will prove the entirety of the conduct for which Corbin was convicted  driving while intoxicated and failing to keep right of the median  to establish essential elements of the homicide and assault offenses. Therefore, the Double Jeopardy Clause bars this successive prosecution.... This holding would not bar a subsequent prosecution on the homicide and assault charges if the bill of particulars revealed that the State would not rely on proving conduct for which Corbin had already been convicted (i.e., if the State relied solely on Corbin's driving too fast in heavy rain to establish recklessness or negligence).
495 U.S. at 522-23, 110 S.Ct. at 2094 (emphasis added). The State makes an Olympian leap in logic from the dicta contained in the above paragraph to its argument that what conduct is involved is not the central inquiry. The State does so by contending that in Grady, driving constituted conduct and intoxication a condition, yet the Grady court expressly would permit Corbin to be subsequently prosecuted for the same conduct, driving (i.e., driving too fast in heavy rain). Thus, so the argument would go, the Supreme Court did not really mean that the same conduct may not be prosecuted twice.[16] Here, the State argues similarly that attempted anal-genital contact is conduct and HIV-positive is a condition, so the Double Jeopardy Clause would permit a subsequent lewd and lascivious prosecution of Lewis by alleging attempting anal-genital contact, the conduct, without proof of HIV infection, the condition.
As shown above, however, it is impossible to escape the Grady court's express holding that the proper inquiry involves examining conduct, not evidence adduced, as well as myriad other references to "conduct," even in the paragraph cited by the State. The Grady court obviously considered that driving while intoxicated is a separate course of conduct from driving too fast, the driving amounting to a "transaction"[17] consisting of various separate courses of conduct. This definition is as thin as the definition of "conduct" should *414 be spread.[18] Thus, the state would need to argue that attempting anal-genital contact while HIV-positive is a separate course of conduct from the same instance of attempted anal-genital contact without proof of such status, by the same person at the same time.
Such an argument defies common sense. Corbin engaged in at least three courses of conduct as alleged in the first prosecution: he drove while intoxicated, failed to keep to the right of median, and drove too fast. These courses of conduct were all separate courses of conduct, although, all three occurred roughly contemporaneously. For instance, Corbin could have driven too fast without driving while intoxicated, or vice versa. Hence, as the Supreme Court suggested, it was possible to have a subsequent prosecution on the homicide and assault charges using only the conduct of driving too fast as proof of intent in the assault and homicide prosecutions.
The distinction becomes obvious when applying the same analysis to the instant case. The State alleged in both the HIV case and the lewd and lascivious case that Lewis had attempted to engage in anal-genital contact with the victim. The only conduct actually constituting the element of attempted transfer of body fluid in the HIV case was attempted anal-genital contact. Such a transfer would be impossible without the conduct comprising attempted anal-genital contact  the same conduct that constituted an essential element in the subsequent lewd and lascivious case  unlike the situation in Grady, where Corbin's speeding occurred independently of homicide and assault. If the State had alleged in the HIV case that Lewis attempted anal-genital contact but had alleged in the lewd and lascivious case that he engaged in only oral-genital contact, it would be possible for Lewis to commit the attempted transfer without engaging in the conduct charged in the lewd and lascivious case, and vice versa. In this hypothetical situation, the oral-genital contact and attempted anal-genital contact would have occurred within the same transaction but would not constitute the same conduct. Thus, this hypothetical second prosecution would have been permitted by the Double Jeopardy Clause, since the Supreme Court has expressly rejected the "same transaction test." Grady, 495 U.S. at 523 n. 15, 110 S.Ct. at 2094 n. 15. The above analysis is tortuous, but, again, common sense tells us that one instance of attempted anal-genital contact is not two courses of conduct. And if the Double Jeopardy Clause bars anything, it bars prosecuting the accused twice for the exact same course of conduct.
The prosecution's allegations of Lewis's conduct  the only relevant inquiry under Grady and its progeny  amounted to the same instance of attempted anal-genital intercourse in both prosecutions. And in using the entirety of the conduct for which Lewis had previously been prosecuted, i.e., attempted anal-genital contact, the government sought to establish an essential element of the lewd and lascivious offense, i.e., a lewd or lascivious act.
The alleged oral-genital contact raises another question.[19] As explained above, Grady would permit subsequent prosecution of Lewis for alleged oral-genital contact because the oral-genital contact was conduct separate from the attempted anal-genital contact and because oral-genital contact was not the conduct for which Lewis was prosecuted in the HIV case. The fact remains, however, that the State in the lewd and lascivious case inexplicably alleged both oral-genital contact and attempted anal-genital contact. Because it is impossible to determine whether the jury convicted Lewis on the lewd and lascivious charge based on the anal-genital contact, *415 the oral-genital, or both and because the subsequent allegation of attempted anal-genital contact violated a fundamental constitutional right, this error cannot be considered harmless.
Concluding that Lewis was twice prosecuted for the same conduct does not end all inquiry of whether the Double Jeopardy Clause bars the subsequent prosecution. Reprosecution after a mistrial is permissible if the defendant requested or acquiesced in the mistrial. U.S. v. Dinitz, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976). Here, the trial judge in the HIV case sua sponte declared a mistrial, to which Lewis objected. Reprosecution after mistrial is also permissible if there was a "manifest necessity" for the mistrial. See, e.g., United States v. Perez, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824). A review of the record reveals not a scintilla of necessity in the trial judge's declaration of mistrial. The trial judge held proceedings in which he declared,
Now, Mr. Lewis, it has come to my attention via the media and statements that this case is beginning to have a great deal of press coverage, and as I understand from sources that I've received that apparently there was even a TV special yesterday in regard to this matter, though I didn't see it.... And I note, for the record, that I accepted a letter regarding some personal problems or life of myself. And while I don't know of anything on my own life that has any effect on this, I can't see how I can handle this case anymore with the publicity and the things that are going on.
Transcript of Proceedings of October 30, 1989, p. 1. If excess publicity were a problem, the trial judge would have possessed various other remedies to deal with it. Certainly, the sole act of substituting a new judge would not solve the perceived problem of excess publicity. Too, the judge's cryptic reference to a letter is not explained. Two remedies would then appear to be appropriate: either this Court should vacate the judgment of conviction or it should remand back to the trial court in the lewd and lascivious case to determine by evidentiary hearing whether manifest necessity for the new trial existed in the HIV case.

II. The Prosecution Did Not Move to Impanel a Jury from Another County.
In its discussion of this issue, the majority apparently accepts Lewis's argument that a trial court may not sua sponte order selection of a jury from another county. This position is correct, in light of I.C. §§ 19-1816, 19-1801, and 19-1808; I.C.R. 21; and State v. Ash, 94 Idaho 542, 493 P.2d 701 (1972). The Court then proceeds to conclude that the State did move for the change of jury selection. This conclusion is based solely on the fact that the prosecution stated that "a change of venue is appropriate in terms of selecting a jury" after the district court repeatedly had mentioned that it was considering resorting to an out-of-county jury selection. The first mention of out-of-county jury selection appears in the following exchange at a status conference:
Mr. Cahill [Lewis's counsel at trial]: ... I realize that the court had us here for some reason that I am not really sure has to do with the jury selection, and perhaps I should just talk to him [Lewis]. [] If I could have some time to talk to him to see what his position is going to be ... is the court contemplating jury selection outside of this jurisdiction? The Court: I am thinking about it, yes. What I would like to do is let you know what topics we are going to discuss today, and I will give you a time to discuss the matter with your client....
Tr., Vol. I, p. 2 (emphasis added). The trial court continues by analyzing why it believes such an action would be necessary, concluding

My feeling is at this point, ... that the wisest course would be to leave the county, go to another district, choose a jury there, keep the jury sequestered for the trial, and try it in Ada County, but choose the jury elsewhere. That would be my feeling that that is probably the best course.
*416 Id., p. 5 (emphasis added). It then granted a ten-minute recess to allow Mr. Cahill to discuss the jury selection matter, as well as the other matters the court brought up for discussion, with his client. After the recess, the trial court returned to the topic:
The Court: All right, now, about the other issues, do you have any input on the issue of whether or not we should choose an out-of-county jury in this case?"
Mr. Cahill: Your Honor, after discussing the matter, we certainly appreciate the court's concern. However, it is our desire that jury selection take place in Ada County. We do not  we are not moving for a change in venue, in other words.
The Court: The State?
Mr. Rosenthal [the prosecutor]: Your Honor, I think in light of the publicity that has taken place ... I think a change of venue is appropriate in terms of selecting a jury....
Tr., Vol. I, pp. 7-8 (emphasis added).
In light of the above, the majority's concept of "motion" here is nothing less than bizarre. It is clear that the trial court brought up the issue of out-of-county jury selection sua sponte and then merely asked whether the parties had "input." In the earlier exchange, Mr. Cahill noted that the trial court had called the parties there to discuss matters, including, perhaps, jury selection. The prosecution merely acquiesced in the trial court's suggestion after the trial court had engaged in substantial analysis on its own, without the parties' input.
Clearly, the prosecutor did not provide any sort of notice to Lewis that he was "moving" for a change in venue or for a change in county for the purposes of jury selection. As State v. Ash, 94 Idaho 542, 493 P.2d 701, explained, in holding that a trial court may not change venue on its own motion, "There is a good reason for this rule: under it, both parties have an opportunity to present their views on the necessity for a change of venue to the court before its decision on the issue." Ash, 94 Idaho at 545, 493 P.2d at 704 (emphasis added). This is no less true than for a motion for selecting an out-of-county jury. A ten-minute recess culminating in an exchange between the parties and the court comprising less than a page of transcript demonstrates that the court provided neither party with an opportunity to present their views fully and effectively.
Furthermore, Idaho Criminal Rules require that a pre-trial motion be in writing. Rule 21 requires that "[t]he court upon motion of either party shall transfer the proceeding to another county if the court is satisfied that a fair and impartial trial cannot be had in the county where the case is pending." I.C.R. 21(a) (emphasis added). Rule 12, which governs motions before trial, states in relevant part that "[e]very pleading, motion, notice, or judgment or order of the court shall be typed with black ribbon or produced by a computer or word processor type printer...." I.C.R. 12(c). It is evident, then, that the State should have put its "motion" in writing.[20]
Another good reason to require a motion and thus notice is that a change in venue (or a change in jury pool) implicates a substantial and express constitutional right. The Sixth Amendment of the United States Constitution commands, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law...." Such a change in venue or jury pool should not occur lightly, on the whim of the district court, but should be fully argued by both parties, with time for them to consult relevant law.
In view of the above, and in view of the fact that I.C. § 19-1816 requires a previous motion for transfer of venue before a trial court may impanel a jury from another county, the State's mere acquiescence in *417 the trial judge's motion to impanel an out-of-county jury is not a "motion."[21]

III. "And Then There Was James" Exceeded the Scope of the Search Warrant and Thus Should Have Been Suppressed.
Putting aside whether the majority correctly concludes that probable cause existed for issuance of the search warrant, it is not correct in asserting that the document entitled "And Then There Was James" ("James") fell within the scope of the warrant. Hence, the trial court erred in denying Lewis's motion to suppress "James."
The search warrant provided that the police could search for "memorabilia of victims ...; a diary listing names of victims and activities engaged in." Again, the majority distorts commonly understood, unambiguous words in order to affirm Lewis's conviction. "James" is a short narrative, perhaps fiction, told as a flashback in the first-person. As such, it cannot qualify as a "diary" as defined by the majority  "a register or record ... kept daily or at frequent intervals" because "James" appears on its face to be only one day's worth of writing. And if the narrative is fiction, which it may well be, it cannot qualify as a "record" or therefore "memorabilia."[22] Moreover, the majority's analysis implodes when one actually reads the warrant; "James" does not qualify as either a diary or memorabilia as defined by the search warrant. Both of these warrant provisions describe items containing descriptions of multiple victims. "James," however, is a narrative, perhaps fictional, about sexual activity which the narrator conducted with a nineteen year old male who is described as having "the soft, unworried look of a fifteen-year-old." Even if "James" describes a non-fictional incident, which is by no means clear, the recipient of adult, consensual sex can hardly be called a "victim." Moreover, "James" only concerns sexual activity with one person.
The fact that "James" is not even remotely described in the search warrant is particularly troubling because, as the majority opinion notes, "James" is clearly expressive material. That opinion, however, goes on to cite State v. Claiborne, 120 Idaho 581, 818 P.2d 285 (1991), for the proposition that expressive material "is seizable with a valid warrant or under one of the exceptions to the warrant requirement just as any other piece of evidence of a crime would be." Claiborne, 120 Idaho at 585, 818 P.2d at 289. This quotation is disingenuous when Claiborne is read in its entirety. In Claiborne, this Court held that a book plainly and on its face constituting "sexually exploitative material," as defined and barred by a criminal statute governing child pornography, could be seized because it was "at the same time evidence of the crime of possession of sexually exploitative material," not because it was evidence of the underlying lewd and lascivious crime for which Claiborne was prosecuted. Id. A narrative describing sex between two adults does not on its face violate any criminal statutes, since it is not clearly obscene unless and until so judged after a trial. Thus, "James" falls outside the rationale of Claiborne but within the rationale of Maryland v. Macon, 472 U.S. 463, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985): "The First Amendment imposes special constraints on searches for and seizures of presumptively protected material, and requires that the Fourth Amendment be applied with `scrupulous exactitude' in such circumstances." 472 U.S. at 468, 105 S.Ct. at 2781 (quoted in Claiborne, 120 Idaho at 583, 818 P.2d at 287). As explained above, *418 a better view is that "James" does not at all fall within the scope of the warrant. But even if one accepts the majority's arguments as to "James" falling within "memorabilia" or "diary," the narrative does so with a remarkable amount of ambiguity.
The fact that "James" is clearly expressive material which was not described with particularity in the search warrant should mandate a holding that the district court erred in denying Lewis's motion to suppress and in thereafter admitting "James" as evidence.

IV. Detective Armstrong's Testimony and Prior Uncharged Sexual Contact with Victim Constituted Prejudicial Character Evidence and Thus Should Have Been Excluded.
The majority contends that Lewis waived the issue of whether Detective Armstrong's testimony violated I.R.E. 404(b) because Lewis failed to cite the specific rule in his objection. Nonetheless, the majority admits that Lewis's counsel did object to the proffered testimony on the grounds that the statement "open[ed] the door" to prior convictions, i.e., bad acts. Rule 404(b) is entitled "Other crimes, wrongs or acts." The majority's hyper-technicality is patent and unfair. Keeping in mind the intense and quick-moving nature of a trial, it is unrealistic to expect counsel to object to a piece of evidence in precisely the same manner that he or she would later raise the issue on appeal. As a matter of law, it is plain that Lewis adequately preserved the issue of Armstrong's testimony for appeal.[23]
Rule 404(b) bars the admission of evidence of "other crimes, wrongs, or acts" for the purpose of "prov[ing] the character of a person in order to show that he acted in conformity therewith." I.R.E. 404(b). It is difficult to imagine a statement which contravenes this rule greater. The prosecution offered Detective Armstrong's testimony to suggest that Lewis possessed an attraction to "adolescent boys" and thus possessed a propensity to engage in sexual behavior with them. The State does not assert any Rule 404(b) exception (for instance, that the testimony was offered for other purposes, such as proof of motive or intent), presumably because there is no exception within which the testimony falls.
As for the evidence of prior uncharged sexual contact with the victim, this justice stands by his dissent in State v. Phillips, 123 Idaho 178, 845 P.2d 1211 (1993). State v. Tolman, 121 Idaho 899, 828 P.2d 1304 (1992), and its progeny were wrongly decided in that they expand the "common scheme or plan" exception in I.R.E. 404(b) to engulf and render meaningless the general rule therein: that evidence of other acts is not admissible to attempt to show a defendant's person's propensity to engage in such acts. What the majority refers to as a "plan" is nothing more than evidence offered to prove the character of Lewis as a pedophile, thus intimating to the jury that he acted in conformity with that character. Also noteworthy is that the majority's rationale that the jury should hear the evidence of prior, uncharged acts because the jury is "better able to compare patterns and methods," etc., ignores that the jury is also better able to conclude that since Lewis engaged in earlier acts, he 1) committed in the charged act or 2) deserved to be punished for the charged acts, even if the latter were not proven beyond a reasonable doubt. The raison d'etre of the rules of evidence is that not every piece of evidence should go to the jury, and for good reason.

V. Dr. Oyler's Testimony that the Victim Fit the Profile of a Sexual Abuse Victim and that the Victim Had Been Abused Should Not Have Been Allowed.
For the most part, the majority opinion correctly disposes of Lewis's claim that Oyler's *419 testimony was improper. The troubling aspect of Oyler's testimony involves the following exchange between the prosecutor and Oyler:
[Prosecutor]: Doctor, based on your training, your education, and your experience, as well as on your evaluation, therapeutic intervention with [the victim], can you state with a reasonable psychological probability whether [the victim] has been sexually abused?
[Oyler]: He clearly fits the profile, and based on that, I would say yes.
Tr., Vol. IV, p. 694.
First of all, although Lewis did not object as to foundation, it is notable that Oyler never testified as to what this "profile" might be or what character traits it might consist of. If Oyler had testified as to psychological or behavioral traits of which a profile of a sexually abused youth might consist  laying the appropriate scientific foundation, of course  and then noted which of these the victim exhibited, such testimony would be permissible, provided that it is beyond the knowledge of the average juror and that it is scientifically sound. Second, notwithstanding this Court's decision in State v. Hester, 114 Idaho 688, 760 P.2d 27 (1988), it is an inappropriate invasion of the jurors' factfinding function for an expert witness to proceed the extra step and to conclude that a victim has actually been abused. Only the jury is entitled to arrive at that conclusion if it so chooses based upon the testimony it has heard.

Conclusion
Because of all of the constitutional, statutory, and evidentiary errors noted above, this Court should reverse and vacate the conviction. A neutral system of justice demands no less.
NOTES
[1] Despite the court's ruling regarding Lewis' HIV status, Lewis decided to tell the jury in this case of his HIV status. During the in camera pre-trial motions, Lewis' attorney informed the judge that Lewis had decided to tell the jury of his HIV status. The trial judge warned Lewis of doing so, explaining the possible consequences, and Lewis' attorney responded that it was a matter of trial tactics. During the voir dire of prospective jurors, Lewis' attorney said, "Mr. Lewis has tested positive for the HIV virus, the AIDS virus." Finally, during the closing argument, Mr. Lewis, acting as his own attorney, stated, "I am infected with the HIV virus."
[2] On the second day of jury trial, November 30, 1989, Lewis filed a motion to represent himself. Mr. Cahill had been representing Lewis. The court granted the motion.
[3] We apply the 1984 version of this statute instead of the 1992 version because the conduct giving rise to this prosecution took place prior to the 1992 amendment. This statute provides:

18-1508. Lewd conduct with minor or child under sixteen.  Any person who shall wilfully and lewdly commit any lewd or lascivious act or acts upon or with the body or any part or member thereof of a minor or child under the age of sixteen (16) years, including but not limited to, genital-genital contact, oral-genital contact, anal-genital contact, oral-anal contact, manual-anal contact, or manual-genital contact, whether between persons of the same or opposite sex, or who shall involve a minor or child in any act of bestiality or sado-masochistic abuse or lewd exhibition as any of such acts are defined in section 18-1507, Idaho Code, when any of such acts are done with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of such person or of such minor or child, shall be guilty of a felony and shall be imprisoned in the state prison for a term of not more than life.
[4] This statute provides:

39-608. Transfer of body fluid which may contain the HIV virus  Punishment  Definitions  Defenses.  (1) Any person who exposes another in any manner with the intent to infect or, knowing that he or she is or has been afflicted with acquired immunodeficiency syndrome (AIDS), AIDS related complexes (ARC), or other manifestations of human immunodeficiency virus (HIV) infection, transfers or attempts to transfer any of his or her body fluid, body tissue or organs to another person is guilty of a felony and shall be punished by imprisonment in the state prison for a period not to exceed fifteen (15) years, by fine not in excess of five thousand dollars ($5,000), or by both such imprisonment and fine.
(2) Definitions. As used in this section:
(a) "Body fluid" means semen (irrespective of the presence of spermatozoa), blood, saliva, vaginal secretion, breast milk, and urine.
(b) "Transfer" means engaging in sexual activity by genital-genital contact, oral-genital contact, anal-genital contact; or permitting the use of a hypodermic syringe, needle, or similar device without sterilization; or giving, whether or not for value, blood, semen, body tissue, or organs to a person, blood bank, hospital, or other medical care facility for purposes of transfer to another person.
(3) Defenses:
(a) Consent. It is an affirmative defense that the sexual activity took place between consenting adults after full disclosure by the accused of the risk of such activity.
(b) Medical advice. It is an affirmative defense that the transfer of body fluid, body tissue, or organs occurred after advice from a licensed physician that the accused was non-infectious.
[5] U.S. Const. amend. V provides, in relevant part, that "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb...."
[6] The Grady Court further stated:

[I]f in the course of securing a conviction for one offense the State necessarily has proved the conduct comprising all of the elements of another offense not yet prosecuted (a "component offense"), the Double Jeopardy Clause would bar subsequent prosecution of the component offense.
Grady, 495 U.S. at 521 n. 11, 110 S.Ct. at 2093 n. 11.
[7] In Felix, the United States Supreme Court acknowledged that the Grady test was adopted from dicta in Vitale. Felix, ___ U.S. at ___, 112 S.Ct. at 1384.
[8] The State did not contest the New York Court of Appeal's ruling that driving while intoxicated and vehicular manslaughter were barred under state law and Blockburger. Grady, 495 U.S. at 522 n. 13, 110 S.Ct. at 2094 n. 13.
[9] At the end of the Felix Court's opinion, the Court states:

It appears that while Grady eschewed a "same evidence" test and Garrett rejected a "single transaction" test, Garrett v. United States, 471 U.S. 773, 790, 105 S.Ct. 2407, 2417, 85 L.Ed.2d 764 (1985), the line between those tests and the "same conduct" language of Grady is not easy to discern.
Felix, ___ U.S. at ___, 112 S.Ct. at 1385. The Grady decision, which was a 5-4 decision, was written by Justice Brennan. Writing for the Court, he recognized that "[t]he Court ... has `steadfastly refused to adopt the "single transaction" view of the Double Jeopardy Clause'" Grady, 495 U.S. at 523 n. 15, 110 S.Ct. at 2094 n. 15. quoting Garrett v. United States, 471 U.S. 773, 790, 105 S.Ct. 2407, 2417, 85 L.Ed.2d 764 (1985). In Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), the Court was faced with a situation where a defendant was charged with robbing one of six men at a poker party, found not guilty, and subsequently charged with robbing another one of the six men. The Supreme Court reversed because in the first trial, where the defendant was found not guilty, the only "rationally conceivable issue" before the jury was the identity of the defendant as the robber. Ashe, 397 U.S. at 445, 90 S.Ct. at 1195. It is interesting that in Justice Brennan's concurring opinion in Ashe he announced:
In my view, the Double Jeopardy Clause requires the prosecution, except in most limited circumstances, to join at one trial all the charges against a defendant that grow out of a single criminal act, occurrence, episode, or transaction. This "same transaction" test of "same offense" not only enforces the ancient prohibition against vexatious multiple prosecutions embodied in the Double Jeopardy Clause, but responds as well to the increasingly widespread recognition that the consolidation in one lawsuit of all issues arising out of a single transaction or occurrence best promotes justice, economy, and convenience.
Ashe, 397 U.S. at 453, 90 S.Ct. at 1199 (Brennan, J., concurring, joined by Douglas and Marshall, JJ.), (footnotes omitted).
[10] We do have the indictment and certain transcripts from the HIV case before us on appeal.
[11] This statute provides:

18-301. Acts punishable in different ways  Double jeopardy. An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; an acquittal or conviction and sentence under either one bars a prosecution for the same act or omission under any other.
[12] We recognize that Lewis has argued that because of the sua sponte mistrial in the HIV case, the State must show a "manifest necessity" in order to prosecute the lewd conduct case. Sharp, 104 Idaho at 693, 662 P.2d at 1137, citing Arizona v. Washington, 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978); Downum v. United States, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963). In order for the district court to allow for a "retrial of [Lewis]," i.e., a refiling of the HIV charge, the State would have had to prove a "manifest necessity" for the sua sponte mistrial. Sharp, 104 Idaho at 693, 662 P.2d at 1137. Based upon our decision on the double jeopardy claim, we need not address the "manifest necessity" issue.
[13] "Memorabilia" means "things remarkable and worthy of remembrance or record" and "a record of noteworthy things." Webster's Third New International Dictionary 1408 (1986). "Diary" means "a register or record of events, transactions, or observations kept daily or at frequent intervals," "a record of personal activities, reflections, or feelings," and "a book intended or used for a diary." Webster's Third New International Dictionary 625 (1986).
[14] The reference to "passing" semen "onto or into [the victim]'s body" is somewhat ambiguous, in light of the evidence adduced that Lewis ejaculated onto the victim's body but did not actually engage in actual anal-genital contact. Nonetheless, the indictment must refer to the attempted anal-genital contact only. Idaho Code § 39-608, the statute under which Lewis was originally prosecuted, specifically defines "transfer," an essential element of the crime (absent a specific intent to infect), as "engaging in sexual activity by genital-genital contact, oral-genital contact, [or] anal-genital contact...." Nowhere in this definition can one find semenskin contact, nor would one expect to, since the HIV virus has rarely, if ever, been shown to be transferred by such means.
[15] As far as can be ascertained from the record before the court, the jury was instructed that Lewis could be convicted in the lewd and lascivious trial for both oral-genital and attempted anal-genital contact. The charging documents, statements of the prosecution's theory of proof, should be binding until challenged by the State. Cf. Grady, 495 U.S. at 522-23, 110 S.Ct. at 2094. Here, the State never claims that Lewis was convicted only for the oral-genital contact, not for the attempted anal-genital contact. In fact, the State candidly admits, "The attempted anal penetration that formed part of the basis for this charge [the attempted transfer of body fluids which may contain the HIV virus] was the same act as the attempted anal penetration charged in the lewd conduct case." Respondent's Brief, p. 5. The State's reference to "part of the basis of this charge" is unclear; in light of the discussion in the above footnote, the "rest of the basis" for the HIV charge must be the other elements of the offense, including the fact that Lewis was HIV positive.
[16] At least one problem with the State's analysis is that Grady's holding involves a vertical comparison  that is, between the conduct for which the defendant is first prosecuted and the conduct for which he or she is subsequently prosecuted. Grady does not purport to concern itself with a horizontal comparison  that is, between conduct that might have been charged in the first prosecution and conduct actually charged in that same prosecution.
[17] The term "transaction" is used because it falls within the United States Supreme Court's terminology, not because it is necessarily the best choice of word. (The same might be said of "conduct," and in fact the Court in Felix acknowledged that "[i]t appears that while Grady eschewed a `same evidence' test, and Garrett rejected a `single transaction' test, Garrett v. United States, [471 U.S. 773, 790, 105 S.Ct. 2407, 2417, 85 L.Ed.2d 764 (1985)], the line between those tests and the `same conduct' language is not easy to discern.")
[18] This Court should not give credence to the perilous sophistry needed to conclude that being HIV positive constitutes conduct. People are generally known to drink a lot for the purpose of getting drunk; on the other hand, people generally do not receive blood transfusions or engage in unprotected intercourse for the purpose of getting the AIDS virus. Moreover, intoxication is a temporary, controllable state and much more akin to conduct rather than HIV-positive status, which, as of now, is a permanent and incurable condition.
[19] Oddly enough, this issue was not raised by the State.
[20] Even if we were inclined to overlook the plain language of the Idaho Criminal Rules, the State still should have substantially complied with such regulations  that is, it should have provided notice to Lewis.
[21] Because of my suggested disposition of the procedural aspect of the jury charge, I do not address Lewis's substantive constitutional argument. Unfortunately, neither does the majority, except for its introductory sentence: "We hold that the district court did not violate a constitutional right or abuse its discretion by selecting a jury from another county...." Because of its disposition of the procedural issue, the majority should discuss beyond a one-sentence conclusion Lewis's contention that even if the appropriate procedure was followed, the jury selection violated his substantive Sixth Amendment rights.
[22] Since "James" implicates the First Amendment as explained below, this court should err on the side of caution and presume that "James" is fiction and therefore not memorabilia.
[23] I agree with the majority that Lewis did not preserve the admissibility of "James" beyond the search warrant issue dealt with in the motion to suppress hearing. This is unfortunate, because the probity and relevancy of the document was minimal at best, while the potential prejudicial effect was enormous. Thus, had the issue been preserved properly, the inescapable conclusion would be that the admission of "James" violated I.R.E. 403.